In the Interest of K.S., A Minor Child.

K.S., Mother, Appellant.

No. 93–1033.

Court of Appeals of Iowa.

Dec. 29, 1993.

Kevin S. Maughan of Clements, Pabst, Hansen & Maughan, Albia, for appellant.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Sp. Asst. Atty. Gen., and Kathrine S. Miller–Todd, Asst. Atty. Gen., for appellee.

Daniel P. Wilson of Drake, Wilson & Jay, Centerville, guardian ad litem for minor child.

Heard by OXBERGER, C.J., HABHAB, J., and McCARTNEY, S.J.*

HABHAB, Judge.

The natural mother, K.S., appeals from an order terminating her parental rights to her daughter, K.S., born April 12, 1990.

This matter first came to the attention of the Department of Human Services (DHS) when the child was diagnosed as suffering from a non-accidental skull fracture. The child was removed from the mother's care by ex parte order on January 30, 1991. On February 1, 1991, a child in need of assistance (CINA) petition was filed.

A combined temporary removal and adjudicatory hearing was held on March 28 and April 29. The mother and her boyfriend testified the child had fallen off the couch on a couple of occasions. They also stated the baby-sitters might have been responsible. The mother's statements at the hearing were inconsistent in parts to previous statements she had made to her friend and a social worker.

Experts testified the injury was inconsistent with the mother and her boyfriend's explanation. Dr. Wilbur Smith, Professor of Pediatrics and Director of Clinical Services for Radiology at the University of Iowa testified the force necessary to cause such an injury was that of an automobile accident, a blow with either a blunt object, a fist, or a kick to the head, swinging the child against the wall, dropping the infant, or having her take a "header" out of a shopping cart onto a concrete floor, or falling from a second-story window. He stated it was unlikely such an injury could have occurred from a slap or from the child falling off a couch onto a carpeted floor. The force used to cause such a big fracture was severe and potentially fatal.

With respect to the effect on the child, Dr. Smith testified she could have been knocked unconscious; but, if not, she would have "cried, howled, yelled. This would have been a painful injury that would have been evident to a competent caretaker or casual observer that this kid had really had a heavy smack on the head."

The juvenile court found the mother's and her boyfriend's testimony lacked credibility. It concluded the mother was the primary caretaker of the child at the time of the injury. Either she or her boyfriend struck or caused the child to be struck on the side of the head resulting in the skull fracture. The striking was not accidental. The juvenile court expressly excluded the baby-sitters of the child as perpetrators. It found the mother failed to properly supervise the child in not protecting her from such an injury and in not securing medical attention.

In a May 9, 1991, order the juvenile court adjudicated the child CINA pursuant to Iowa Code sections 232.2(6)(b) (parent physically abused or neglected child) and (6)(c)(2) (inadequate parental supervision); the child remained in foster care placement. The mother was allowed supervised visitation only and ordered to undergo substance abuse evaluation and outpatient psychiatric evaluation.

In May an evaluation revealed that the child had a profound hearing loss and it was

---

* Senior judge from the 2nd Judicial District serving on this court by order of the Iowa Supreme Court.

recommended that sign language be used to develop her communication skills. The mother agreed to learn sign language. The child was moved to a foster home where sign language was known.

Review hearings were held on February 27 and August 27, 1992. The juvenile court found the mother's living situation had been unstable, she had been convicted of domestic abuse involving her current live-in boyfriend, she continued to deny involvement in or knowledge of the child's head injury, she failed to participate in substance abuse treatment until just before the August hearing, and she had not been taking sign language instruction which was "a virtual necessity in any prospective substantial care of the child." The court ordered DHS to prepare a petition for termination, which was filed on September 9, 1992.

The termination hearing was held on March 4 and April 14, 1993. The mother was then living in Missouri with a different man, whom she planned to marry following his graduation from a drafting program. They were unsure where he would seek employment or where they would be living after he graduated. He and his three children did not know sign language.

The child was under consideration as a candidate for a cochlear implant and was in need of a stable and supportive environment for her special needs. On June 4, 1993, the juvenile court terminated the mother's parental rights pursuant to 232.116(1)(c), (e) and (g). The mother appeals, we affirm.

■ Our review of termination proceedings is de novo. *In re W.G.,* 349 N.W.2d 487, 491 (Iowa 1984) *cert. denied sub nom. J.G. v. Tauke,* 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). We give weight to the findings of fact of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92.

■ The primary concern in termination proceedings is the best interest of the child. Iowa R.App.P. 14(f)(15); *In re Dameron,* 306 N.W.2d 743, 745 (Iowa 1981).

We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*In re R.M.,* 431 N.W.2d 196, 199 (Iowa App. 1988) (citing *Dameron,* 306 N.W.2d at 745).

■ Iowa Code section 232.116(1)(g) (1991) permits the juvenile court to terminate the parent-child relationship if the court finds all of the following have occurred:

(1) The child is three years of age or younger.

(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

(3) The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least six of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.

(4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The mother admits the child was three years old at the time of the termination hearing, the child has been adjudicated a child in need of assistance, and custody has been transferred for at least six of the last twelve months. The mother argues the State has failed to prove by clear and convincing evidence the fourth element, that harm will come to the child if she is returned to her.

At the time of the CINA adjudication, the child suffered a severe head injury. On March 16, 1993, shortly before the termination hearing, psychiatrist Dale Armstrong evaluated the mother. He stated:

[A]fter reviewing all of the documents I am concerned for a number of reasons. One, there remains no definitive explanation for

the origin of the skull fracture and all of the evidence seems to suggest that [the mother] was somehow responsible for this. Number two, she has a history of very impulsive, irresponsible behavior and even after the child was removed she has been unable to stabilize and establish a stable environment. Three, she has had difficulty complying with the court ordered treatments. Four, she has demonstrated aggressive behavior in the past that has resulted in assault charges. This suggests considerable difficulty in impulse control. . . . If in fact [the mother] is responsible for the fracture that is an injury of such severity it is hard to imagine that the child would not be at risk again for subsequent physical trauma. The . denial that [the mother] expresses is consistent with people who abuse children . . . .

. . . Whether she could and would utilize her resources to provide the environment that would allow this child to thrive is impossible to predict. The past record is not encouraging.

The mother still asserts neither she nor her former boyfriend injured the child. She claims the child was accidentally injured at the baby-sitters' house. The "requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs." *In re of H.R.K.,* 433 N.W.2d 46, 50 (Iowa App.1988). We find the mother is still unable to protect her child from abuse.

We find clear and convincing evidence that the child cannot be returned to the custody of her mother. We find the statutory grounds for terminating the mother's parental rights pursuant to Iowa Code section 232.116(1)(g) have been met. We, therefore, need not decide whether there are statutory grounds for terminating the mother's parental rights pursuant to Iowa Code section 232.116(1)(c).

■ Having determined there is clear and convincing evidence to support the termination, we look now to whether the best interests of the child would be served by terminating the mother's parental rights.

■ Our supreme court has said that a child should not be forced to endlessly suffer the parentless limbo of foster care. *In re D.J.R.,* 454 N.W.2d 838, 845 (Iowa 1990). To continue to keep children in temporary foster homes is not in their best interests. *In re J.L.P.,* 449 N.W.2d 349, 353 (Iowa 1989).

This is especially true in this case. The child, here, is a special needs child. She is profoundly hearing impaired. A successful cochlear implant operation would give her a better awareness of environmental sounds for safety purposes and help improve her speech development. The sooner the implant is done, the better the chance it will provide the maximum amount of benefit. However, the child can not be considered for a cochlear implant unless some kind of commitment is made for the five-year follow-up period. A very stable and structured environment is necessary for the implant to succeed. The majority of stimulation must come from the family. Everyone in direct contact with the child on a daily basis needs to be able to communicate with her through sign language. If the family is not committed to signing, the child will regress.

We find it unlikely the mother in the near future will be able to provide the stable and structured environment necessary for her child. The foster parents are willing and able to provide the stable and structured environment if the mother's rights are terminated. We find the best interest of this child would be served by terminating her natural mother's parental rights.

**AFFIRMED.**