# IN THE SUPREME COURT OF IOWA

No. 128 / 06-0459

Filed November 17, 2006

**IN THE INTEREST OF J.E., Minor Child,**

**R.E., Mother,**

Appellant.

vs.

**STATE OF IOWA,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Wapello County, William S. Owens, Associate Juvenile Judge.

State seeks further review after court of appeals reversed a juvenile court's termination order. **DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.**

Michael O. Carpenter of Webber, Gaumer & Emanuel, P.C., Ottumwa, for appellant.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, and Jason Helm, Assistant County Attorney, for appellee.

Robert E. Breckenridge and Kenneth A. Duker of Breckenridge & Duker, P.C., Ottumwa, guardians ad litem for minor child.

**STREIT, Justice.**

Due to a mother's neglect of her ten-year-old son, a juvenile court terminated her parental rights. The Iowa Court of Appeals reversed the juvenile court's decree. Because the child cannot be safely returned to his mother's care and because termination is in the child's best interests, we vacate the court of appeals' decision and affirm the decree of the juvenile court.

## I. Facts and Prior Proceedings

Jerimiah was born on April 17, 1996. He is of low intelligence and suffers from attention deficit/hyperactivity disorder (AD/HD). He operates on a much younger level than his age and is unable to make good or safe decisions. Jerimiah also has heart arrhythmia. He requires medication and a low-sugar, no-caffeine diet.

His mother is Robyn and his father is alleged to be either Luther of La Plata, New Mexico or Kevin of Lakeside, Arizona. Jerimiah does not have a relationship with either man. Robyn has five other children: Cody, born January 28, 1989; Cory, born September 18, 1990; Elyjah, born September 19, 1992; Cheyana, born September 12, 2000 and Savanah, born July 14, 2002. Robyn's two daughters live with their father, Michael, in Ottumwa.[1] During the juvenile court proceedings, Elyjah lived with his father, Luther, in New Mexico part of the time.

Jerimiah first came to the attention of the Iowa Department of Human Services (DHS) on July 7, 2004 when he was taken into custody by law enforcement and placed in foster care. On that date, Robyn had left Jerimiah home alone for up to fourteen hours. Jerimiah was eight

---

[1]Michael obtained a civil restraining order on Robyn. Cheyana was diagnosed as "failure to thrive" and there is a founded report of Robyn not providing adequate medical care for her.

years old at the time. Concerned neighbors called the police because Jerimiah did not know where his mother was or how to contact her. Two neighbors reported Jerimiah was often alone from morning until bedtime. He spent long periods of time at their homes because he was hungry and scared. Jerimiah told one of the neighbors his mother threw all of their food away because their home did not have electricity. While the police officers were interviewing Jerimiah in the front lawn, Robyn drove by. She paused and then drove on. She was later arrested for driving while barred. Robyn does not have her driver's license due to unpaid fines ($5877).

During the investigation of this incident, Robyn admitted to a police officer her home did not have electricity. She consented to a drug test, which came back positive for opiates. Robyn said she had fallen the week before in a parking lot and was taking Tylenol 3 as a result. Her friend also gave her a pill to help with the pain. The test was negative for other substances. Robyn told a police officer she worked every day and had to do community service hours.

A subsequent Child Protective Assessment verified the neighbors' allegations. This was the third founded report for denial of critical care based on Robyn's failure to properly supervise Jerimiah.[2]

---

[2]There was a founded report of denial of critical care concerning Jerimiah and his brother, Cody. On July 9, 2003, Robyn started an uncontained fire outside in order to burn some trash. She went inside leaving Cory and Jerimiah outside. At the time, Jerimiah was seven and Cory was twelve. Jerimiah played in the fire with a stick and burned a neighbor boy who had to be taken to the emergency room by his parents. There was also a founded report of denial of critical care concerning Jerimiah and his two younger sisters. On December 19, 2002, Robyn left Jerimiah and the girls in a vehicle unattended for five to fifteen minutes while she was in her landlord's home. Jerimiah was six and a half years old at the time and Cheyana and Savanah were two years old and five months old respectively. Robyn was unable to drive the children home because her driver's license was suspended.

Two days after Jerimiah was removed from the home, Robyn and Jerimiah's brothers moved because Robyn did not have money to pay the electric bill. They lived for about two weeks at the home of their pastor and then moved to the Crisis Center. In mid-August they moved to a rented home on Kruger Street in Ottumwa. Due to a $700 unpaid electric bill, Robyn had to have the utilities placed in a friend's name. At the end of March 2005 the family moved again to their current home on South Van Buren in Ottumwa. Robyn's gas was shut off in June 2005 because she did not pay her bill. She was able to get the gas turned back on within a few days. Robyn was unemployed throughout the juvenile court proceedings except when she worked at Burger King for three months. The family receives welfare, food stamps, and medical assistance from DHS.

Jerimiah was adjudicated a child in need of assistance on October 12, 2004, as defined in Iowa Code section 232.2(6)(*c*)(2) (2003) and remained in the care and custody of DHS. Numerous services were provided to the family by DHS. Services included parent skill development services for Robyn, psychological evaluation of Robyn, psychiatric evaluation of Jerimiah, and individual therapy for Robyn and Jerimiah. Robyn accepted these services but her participation was inconsistent. At times, Robyn was not awake or was not prepared for parent skills sessions which were conducted in her home. She was also inconsistent in attending Jerimiah's medical and psychiatric appointments although she was requested to do so.

At the department's behest, Robyn began seeing a therapist but failed to regularly attend her appointments. She was diagnosed with AD/HD, depression, and post-traumatic stress disorder. Robyn

acknowledged physical and child sexual abuse by her father. Her mother died of a heart attack when Robyn was just two years old. She dropped out of school in the eleventh grade when she became pregnant.

DHS continues to have concerns with Robyn's parenting ability. At the beginning of this case, Robyn told the in-home provider she relates to her children more as a peer than a parent. Robyn admitted she does not feel she needs to be a parent to her children all of the time "because she doesn't want to bitch at them." The DHS reports Robyn is not affectionate toward Jerimiah and there is not much interaction between the two of them.

At first, DHS limited Robyn to supervised visits with Jerimiah. Robyn progressed to partially unsupervised visits on October 25, 2004. Jerimiah's foster parents agreed to take Jerimiah to Robyn's home for visits and the in-home provider would be present for the second half of the visits. The unsupervised part of the visit was discontinued on November 16, 2004 because Robyn was not keeping her appointments with her therapist and the in-home provider was concerned Robyn was not able to consistently provide a structured environment. Robyn did not regularly have activities and meals planned for Jerimiah during the visits. On February 2, 2005, DHS resumed partially unsupervised visits. Approximately three weeks later, DHS once again limited Robyn to supervised visits with Jerimiah because she was not attending her therapy appointments, was not calling Jerimiah daily as she had been requested to do, and she missed a parent/teacher conference.

In March 2005, DHS resumed partially unsupervised visits because Robyn was calling Jerimiah more consistently and was keeping her therapy appointments. She met with Jerimiah's teacher. She went

to the library and checked out a book on parenting without prompting. Robyn even walked five miles in order to visit Jerimiah.

DHS granted Robyn unsupervised overnight visits with Jerimiah in May 2005. A permanency hearing was held on July 8, 2005, at which time Robyn was given an additional six months to pursue reunification. On August 4, 2005, Robyn's visits with Jerimiah were increased from one overnight to three overnights a week. However, DHS once again limited Robyn to supervised visits after she was arrested for shoplifting at Wal-Mart on August 8, 2005.[3] Jerimiah was in the store with Robyn and saw her get arrested. Robyn initially lied and told the social worker Jerimiah was not with her. Robyn testified at the termination hearing she lied out of fear DHS would terminate her parental rights. Jerimiah told a child protective worker it is okay for his mom to steal if she needs food for her children.

Besides shoplifting, Robyn has made other poor decisions. In December 2004, Robyn was ticketed for allowing her son Cody to drive without a license. In March 2005, Robyn was charged with violating the compulsory school attendance law for her son Cory. According to the school attendance officer, Cory had missed thirty-one days of school by the month of March. Robyn pled guilty and was fined $100. On May 9, 2005, Robyn returned Jerimiah to his foster home thirty to sixty minutes early without notifying the foster parents. Neither foster parent was home so Robyn left Jerimiah in the care of a teenage foster boy. A few days later, Jerimiah told Robyn the boy sexually abused him while they

---

[3]Robyn was also arrested for shoplifting at Econo Foods on July 24, 2005.

were alone.[4]  Additionally, Robyn considered allowing a truck driver, whose last name she did not know, pick up Elyjah in New Mexico and return him to Ottumwa.  After the in-home provider advised Robyn her idea was too risky, Robyn took a bus to New Mexico to pick him up herself.

The State filed a petition for termination of parental rights on October 31, 2005.  The juvenile court held a termination hearing on November 21, 2005.  The in-home provider for the family testified there is a lack of bonding between Jerimiah and his mother.  However, Jerimiah has repeatedly stated he misses his mom and siblings and wants to be home with them.  Jerimiah thinks Robyn is the "best mom ever."  DHS recommended termination because Robyn is unable to provide a consistent, stable, and structured home environment for Jerimiah.  Although Robyn has been able to make progress for short periods of time, she is unable to sustain those changes.

DHS acknowledges Jerimiah has a close relationship with his brothers.  During visits Jerimiah usually played with his brothers.  They would play video games, play sports, draw, talk, joke around, play with action figures or watch movies.  At the termination hearing, Cody testified about his bond with Jerimiah.  He said "we miss him a lot every day . . . .  There's always a void."

Jerimiah is a sweet and loving child.  He is personable and gets along well with other children.  He likes to give and receive attention.  Despite his special needs, DHS considers Jerimiah to be adoptable.

---

[4]To Robyn's credit, she immediately contacted DHS and consoled Jerimiah.  She was very supportive of Jerimiah and fully cooperated with the child protective assessment and police investigation.  Jerimiah was placed in a different foster home.

The juvenile court terminated the parental rights of Robyn, Kevin and Luther (the alleged fathers) on March 7, 2006. Only Robyn appealed. The Iowa Court of Appeals reversed the termination of her parental rights on September 7, 2006. The court "question[ed] whether the State has proved the grounds for termination by clear and convincing evidence" because the court believed DHS made no effort to assist Robyn with child care. Moreover, the court was "not willing to find that Jerimiah's best interests will be served by termination" because of his strong bond with his brothers.

## II.  Scope of Review

We review termination of parental rights de novo. *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002) (citing *In re S.N.,* 500 N.W.2d 32, 34 (Iowa 1993)). We give weight to the factual determinations of the juvenile court but we are not bound by them. *In re T.A.L.*, 505 N.W.2d 480, 482 (Iowa 1993) (citing *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992)). Grounds for termination must be proven by clear and convincing evidence. *In re T.B.*, 604 N.W.2d 660, 661 (Iowa 2000). Our primary concern is the best interests of the child. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001).

> In seeking out those best interests, we look to the child's long-range as well as immediate interests. This requires considering what the future holds for the child if returned to the parents. When making this decision, we look to the parents' past performance because it may indicate the quality of care the parent is capable of providing in the future.

*In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997) (citations omitted).

## III.  Merits

## A.  Whether Jerimiah Can be Returned to Robyn's Care

The juvenile court terminated Robyn's parental rights pursuant to section 232.116(1)(*f*) of the Iowa Code. Under section 232.116(1)(*f*),

parental rights may be terminated if the court finds all of the following have occurred:

(1)     The child is four years of age or older.
(2)     The child has been adjudicated a child in need of assistance pursuant to section 232.96.
(3)     The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
(4)     There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

It is undisputed Jerimiah satisfies the first three elements. Robyn only contends the State has failed to prove by clear and convincing evidence Jerimiah cannot be returned to her custody.

A parent may lose custody of his or her child if the court finds there is clear and convincing evidence "[t]he child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance . . . ." Iowa Code § 232.102(5)(*a*). A "child in need of assistance" means in part "an unmarried child . . . [w]hose parent, guardian, other custodian, or other members of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." *Id.* § 232.2(6)(*b*). In the present case, there are thankfully no allegations Robyn physically abused Jerimiah. However, the record is replete with evidence of neglect. We have previously said "our statutory termination provisions are preventative as well as remedial." *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990). They are designed to prevent probable harm to the child and the State is not required to wait until actual harm has occurred before

moving to terminate a parent's rights. *Id.* (citing *In re A.M.S.*, 419 N.W.2d 723, 726 (Iowa 1988)).

Robyn argues her ability to care for her other sons rebuts the juvenile court's finding that Jerimiah cannot be safely returned to her home. This contention ignores Jerimiah's age and special needs. *See In re T.J.O.*, 527 N.W.2d 417, 421 (Iowa Ct. App. 1994) (citing *In re E.B.L.*, 501 N.W.2d 547, 553 (Iowa 1993) ("Even though a mother may be able to parent some of her children does not necessarily mean she is capable of providing appropriate care to all her children. The special needs and best interests of each child must be evaluated.")). At the time of the termination hearing, Jerimiah's brothers were sixteen (Cody), fifteen (Cory) and thirteen (Elyjah) years old. Jerimiah was only nine years old. Unlike his brothers, Jerimiah has special needs that require extra attention. Due in part to his low intelligence, he lacks knowledge about concepts most kids his age would understand. Jerimiah is unable to make good or safe decisions. He requires constant supervision and thrives on structure. His heart condition also requires medication and frequent doctor visits. While his older brothers may be able to fend for themselves, Jerimiah cannot.

Robyn has a history of leaving Jerimiah home alone for long periods of time. He was placed in foster care after neighbors complained Jerimiah would often come to their homes looking for comfort and food. He did not know where his mom was or how to contact her. One neighbor reported Jerimiah has been to her home from early morning to late at night before without anyone coming to look for him.

Robyn has failed to demonstrate she can provide adequate supervision and care for Jerimiah. At the time Jerimiah was taken into

custody by DHS, Robyn told a police officer Jerimiah was home alone because she worked every day and did community service. However, Robyn told her therapist she had not worked since 1999 when the family lived in Arizona. Moreover, there is no evidence in the record regarding community service. If she did have a community service obligation, we do not know why or the number of hours. Robyn has never explained her long absences from the home. This makes us doubt she would be more attentive to Jerimiah's needs if he is returned to her. *See In re J.W.D.*, 456 N.W.2d 214, 218–19 (Iowa 1990) (finding termination warranted because mother was unable to meet the needs of her child who was of low-average intellectual functioning and behind developmentally).

The court of appeals stated "there is little evidence Jerimiah would not be safe in [Robyn's] care if she had assistance with child care at times she was required to be absent from the home." But based on the record, Robyn is not required to be away from home much because she is unemployed. Robyn never requested assistance with child care. Moreover, two of the founded reports of neglect happened while Robyn was nearby. The first one involved Jerimiah being left in a car with his two younger sisters. The other involved Jerimiah playing with a burning pile of trash. Robyn's erratic sleep patterns also interfere with her ability to supervise Jerimiah. Finally, the shoplifting incident demonstrates Robyn continues to put Jerimiah at risk despite the services provided by DHS. Robyn has not benefited from the services while Jerimiah continues to live in foster care. We find there is clear and convincing evidence Jerimiah cannot be returned to Robyn's custody at the present time or in the reasonably near future.

**B.      Whether it is in Jerimiah's Best Interests to Terminate Robyn's Parental Rights**

Having found section 232.116(1)(*f*) satisfied, we must still determine whether terminating Robyn's parental rights is in Jerimiah's best interests. *In re S.J.,* 451 N.W.2d 827, 832 (Iowa 1990) ("While we have indicated that children should not be made to suffer indefinitely in parentless limbo, the child's best interest may dictate to the contrary."); *see* Iowa Code § 232.116(2) (requiring the court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child" when determining whether to terminate the rights of a parent). Jerimiah has a close relationship with his older brothers. He misses them and they likewise miss him. We have previously stated a preference to keep siblings together. *In re A.M.S.,* 419 N.W.2d at 734 (stating "siblings should not be separated without good and compelling reasons"). However, this preference is not absolute. Our ultimate concern is the best interests of the child. Robyn argues it is in Jerimiah's best interests to be with his family. We are certainly cognizant of the importance of family integrity. This consideration, although valid, cannot overcome the clear and convincing evidence it is in Jerimiah's best future interests to be free for adoption so he may be placed in a permanent and stable home with consistent care. He deserves the chance to start a new life even though this means he has to leave behind the relationships he has with his mother and brothers. We find that despite Jerimiah's bond with his brothers, it is in his best interests to terminate Robyn's parental rights.

We note this is not one of the more egregious cases of neglect or abuse. *See, e.g., In re J.K.,* 495 N.W.2d 108, 110–11 (Iowa 1993)

(parents were severe, chronic drug and alcohol abusers); *In re A.R.S.*, 480 N.W.2d 888, 889–90 (Iowa 1992) (children sexually abused by their mother and three of her male friends); *In re Interest of C & K,* 322 N.W.2d 76, 77–78 (Iowa 1982) (children lived in deplorable conditions). Nor do we question Robyn's love for her children. Nonetheless, our legislature has established a limited time frame for parents to demonstrate their ability to be parents. In this case, the standard is twelve months. Iowa Code § 232.116(1)(*f*). "The legislature adopted the standard in the belief that this period must be reasonably limited because, 'beyond the parameters of chapter 232, patience with parents can soon translate into intolerable hardship for their children.'" *In re C.K.,* 558 N.W.2d at 175 (quoting *In re A.C.,* 415 N.W.2d 609, 613 (Iowa 1987)). "'Children simply cannot wait for responsible parenting.'" *Id.* (quoting *In re L.L.,* 459 N.W.2d at 495). "It is simply not in the best interests of children to continue to keep them in temporary foster homes while the natural parents get their lives together." *Id.* (citing *In re J.L.P.,* 449 N.W.2d 349, 353 (Iowa 1989)). Robyn was given approximately sixteen months to demonstrate her ability to care for Jerimiah. She continues to struggle with the same problems identified at the beginning of the juvenile court proceedings. She has not benefited from DHS's services and Jerimiah continues to suffer. She is unable to provide the structure and consistency Jerimiah needs in order to be safe and reach his full potential.

## IV. Conclusion

The State has proven by clear and convincing evidence Jerimiah cannot be returned to Robyn's custody presently or in the near future. Despite Jerimiah's bond with his brothers, it is in his best interests to

14

terminate Robyn's parental rights so he may be placed in a permanent home with adults who can properly care for him.  We therefore agree with the district court Robyn's parental rights should be terminated.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.**

All justices concur except Cady, J., who concurs specially, and Hecht, J., who takes no part.

128/06-0459, *In the Interest of J.E.*

**CADY, J. (concurring specially).**

I write separately to emphasize the "best interests of the child" standard has taken on a new meaning, within the last decade, which must be considered by courts in using the standard to make decisions to terminate parent-child relationships.

A child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests. *See In re K.M.*, 653 N.W.2d 602, 608 (Iowa 2002) (noting "the child's safety and need for a permanent home" are "the concerns that clearly impact a child's best interests"). This has not always been the case, and reflects a broader change in our country's national policy regarding child welfare laws. *See In re C.B.*, 611 N.W.2d 489, 493–94 (Iowa 2000) (recognizing and summarizing the effect of national legislation on Iowa's child welfare laws). Before 1997, child welfare laws—including Iowa's—focused on reuniting the family unit. *Id.* at 493 (noting our prior legislation sought "to prevent and eliminate the need for removal," and "[t]he focus [wa]s on services to improve parenting"); *see, e.g., Deck v. State Dep't of Human Ress.*, 930 P.2d 760, 765 (Nev. 1997) (noting the district court put in place a reunification plan that continued unsuccessfully for five years); *In re M.B.*, 565 A.2d 804, 810 (Pa. Super. Ct. 1989) ("One of the primary purposes of the Juvenile Act is to preserve the unity of the family whenever possible."). Subsequently, and after Congress's enactment of the Adoptions and Safe Families Act of 1997 (ASFA), national and state child welfare laws emphasized the importance of timely providing children with appropriate custodial care. *See In re K.M.*, 653 N.W.2d at 608 ("In recent years the focus in termination cases has shifted

somewhat from reunification of the family to the child's best interests."); *In re C.B.*, 611 N.W.2d at 493–95 (summarizing the change); *see also In re Lilley*, 719 A.2d 327, 334–35 (Pa. Super. Ct. 1998) (recognizing the impact of ASFA).

More specifically, ASFA dramatically changed the manner in which this country treats children who have been removed from the care of their parents and placed into foster care. *See* Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115 (codified as amended in scattered sections of 42 U.S.C.). The legislation sets firm deadlines for reunification, followed by prompt efforts to terminate parental rights if those deadlines are not met. *See* 42 U.S.C. § 675(5) (2006) (outlining the instances when termination of parental rights are required). ASFA's goals seek to prevent children from languishing in foster care by requiring parents to assume their parental responsibility quickly. *See In re C.M.*, 652 N.W.2d at 208 ("[T]he new federal law shifted the focus from family reunification to 'time-limited family reunification services.' " (quoting 42 U.S.C. § 629(a)(7))); 42 U.S.C. § 675(5) (requiring the state to file a petition to terminate parental rights if the child has remained in foster care "for 15 of the most recent 22 months").

Iowa reacted to this federal legislation and adopted many changes to our child welfare laws in 1998. *See* S.F. 2345, 77th Gen. Assem., Reg. Sess. (Iowa 1998) (codified as amended in scattered sections of Iowa Code chapters 232, 237, 600). Among those changes are additions to Iowa Code § 232.116, which provides the grounds by which a court may terminate parental rights. Iowa Code § 232.116 (2005). Prior to ASFA, Iowa Code § 232.116(2) stated "the court shall give primary consideration to the physical, mental, and emotional condition and needs of the child"

when determining whether to terminate parental rights. Iowa Code § 232.116(2) (1997). After ASFA, that subsection now reads "the court shall give primary consideration to the *child's safety, to the best placement for furthering the long-term nurturing and growth of the child*, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2) (emphasis added); *see In re K.M.*, 653 N.W.2d at 606 (recognizing this distinction and holding the amended changes constitutional).

Our response to ASFA did not change the approach we have always taken in parental termination proceedings. Then and now, "our primary concern is the best interests of the child." *In re S.O.*, 483 N.W.2d 602, 604 (Iowa 1992) (citing *In re Damon,* 306 N.W.2d 743, 745 (Iowa 1981)). But our response to ASFA has significantly, and not too subtly, identified a child's safety and his or her need for a permanent home as the defining elements in a child's best interests. *See In re K.M.*, 653 N.W.2d at 608 ("[T]he amendment did not change the role of a child's best interests in the termination decision. They are now and have long been of paramount importance in such matters. Rather, the [response to ASFA] simply articulated the concerns that clearly impact a child's best interests: the child's safety and need for a permanent home.").

In bygone days, the best interests of a child was a broad concept that embraced a multitude of considerations, and prominently focused on the need to keep families together and to avoid the termination of parental rights if at all possible. No more. We are obligated to incorporate this new policy into the case before us, and it inevitably leads us to the proper result and our disposition. The old policies underlying our previous notions of a child's best interests cannot be used by courts

to circumvent the new policies that are meant to keep children from languishing in foster care. We must apply this new rationale with earnest in each case, as we have here, pursuant to the policies established by our legislature.