**IN THE COURT OF APPEALS OF IOWA**

No. 14-0591
Filed September 17, 2014

**IN THE INTEREST OF N.P.,**
**Minor Child,**

**D.S., Mother,**
**Appellant.**

_____

        Appeal from the Iowa District Court for Mills County, Craig M. Dreismeier,

District Associate Judge.


        The mother appeals the termination of her parental rights to her son, N.P.

**AFFIRMED.**


        Mandy L. Whiddon, Council Bluffs, for appellant mother.

        Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant Attorney

General, Eric Hansen, County Attorney, and Patricia McSorley, Assistant County

Attorney, for appellee State.

        Kathrine Murphy, Glenwood, attorney and guardian ad litem for minor

child.


        Considered by Danilson, C.J., and Vogel and Bower, JJ.

**VOGEL, J.**

The mother appeals the termination of her parental rights to her son, N.P. She asserts the State failed to prove by clear and convincing evidence her rights should be terminated under Iowa Code section 232.116(1)(f) and (g) (2013), and termination is not in N.P.'s best interest due to the parent-child bond. Because we conclude the juvenile court properly terminated the mother's parental rights under paragraph (g), and termination is in the child's best interest despite the bond between him and the mother, we affirm.[1]

N.P., born November 2008, first came to the attention of the Department of Human Services (DHS) on January 10, 2012, due to the mother driving while intoxicated with N.P. in the car. Because it was determined that N.P. and the mother were living out of the car, N.P. was removed from the mother's care and placed with a foster family.[2] He was adjudicated a child in need of assistance (CINA) on June 7, 2012. He was returned twice to the mother's care during the pendency of the proceedings, once from May 30, 2012, until August 1, 2012, and again from April 18, 2013, to May 24, 2013. At the time of the termination hearing, N.P. had been out of the mother's care for twenty-two of the previous twenty-five months.

While removed from her care, the mother had trouble attending scheduled visits with N.P. Out of 210 visits provided to her, she attended 180. She stated transportation was an issue as she no longer had a car, and initially she refused to use public transportation. She eventually began to ride the bus, and even

---

[1] The father's rights were also terminated. He does not appeal.
[2] Each time N.P. was removed from the mother's care, he was placed with the same foster family, where he resided at the time of the termination hearing.

though vouchers were provided for her and other transportation services offered, she still had trouble consistently attending visits. However, at the visits, it was clear to the DHS worker the mother and N.P. shared a bond. For the most part the mother interacted well with N.P., but this positive interaction was dependent upon her mood. When she was upset or agitated, she would focus on the perceived conspiracies against her or her other various problems, rather than focusing on N.P., who would then hide from the mother. Phone calls were also scheduled while N.P. was at the foster home, but again, the mother often did not take advantage of these opportunities and attempt to call.

The mother has several mental health issues. According to the decision approving her social security disability benefits, she suffers from major depressive disorder; bipolar affective disorder; mood disorder; idiopathic hypersomnia; chronic fatigue syndrome; anxiety not otherwise specified; panic disorder; posttraumatic stress disorder; psychotic disorder; schizophrenia; attention deficit hyperactivity disorder; and a personality disorder with antisocial, borderline, histrionic, dependent, and schizoid features. At the termination hearing she testified that many of these diagnoses are not accurate, and that she only suffers from depression, posttraumatic stress disorder, anxiety, and chronic fatigue, as had been diagnosed by her psychiatrist at Mercy Hospital. However, she was reluctant to sign releases regarding her mental health situation, either signing limited releases or quickly revoking them. This is in part due to the fact she believes there is a conspiracy, with DHS workers, the courts, and other

people in authority positions aligned against her.[3]   Additionally, she does not consistently take her medications, ostensibly due to the fact she cannot afford them.[4]

The mother underwent a substance abuse and mental health evaluation at Heartland Family Services, and while she completed the substance abuse treatment,[5] she failed to complete the mental health component.   She was ordered to attend Dialectical Behavior Therapy, but did not complete it as she either failed to appear or arrived one and one-half hours late.   Her attendance at therapy has also been sporadic.   She testified at the termination hearing that she had not seen a therapist from May 2013 until January 2014.

In May 2013, Heartland Family Services reported that:

[The mother] is making more frequent statements of elopement with her son . . . .   Additionally, [the mother] is demonstrating increasing disorganized and irrational thinking, due to increased stress, that lead us to have concern for her ability to most effectively care for herself.   As stated, because we do not work with [N.P.] together with [the mother], we cannot speak to her ability to parent or care for [N.P.].   However, we wanted to emphasize our concern for [the mother's] ability to most effectively care for herself.

Shortly thereafter, on May 23, 2013, the mother informed N.P.'s daycare worker that she was not sure where they would be sleeping that night.

---

[3] For example, the mother researches various people, such as the foster family, and hypothesizes that, because the foster father and the DHS worker's husband share the same first name, they are conspiring against her.   She also believes people are tapping her phone, that the foster mother is not real, and that the foster father is a federal agent. At one point she informed DHS workers that there was a gentleman who was making a documentary regarding corruption in the child welfare industry, focusing on judges, CPS, DHS, and visitation workers.   She stated the documentary would name everyone involved in her case, and that "If I don't get my kid back by Friday, shit is going to hit the fan.  That's all I know."

[4] The mother has been prescribed Ritalin, Buspirone, Prozac, Xanax, Trazodone, and Imipramine.

[5] The DHS worker testified the mother was compliant with drug screens and never tested positive for illegal substances.

Consequently, the DHS worker obtained an ex parte removal order, and informed the mother N.P. would be removed from her care and a hearing held the following week. The mother hung up the phone, and the DHS worker then received a call from N.P.'s daycare stating the mother had absconded with N.P., using him as a shield and a battering ram to remove him from the daycare. The two were apprehended in Omaha, Nebraska on May 26.

The mother's housing situation has been a significant issue throughout the proceedings. She was homeless several times in the past two years, only obtaining housing for five months from December 2012 to May 2013, and then again shortly before the termination hearing. Her Southern Iowa Regional Housing Authority (SIRHA) voucher expired due to lack of use, primarily because she insisted on looking at large houses that would accommodate all of the children to whom her rights had been terminated. Moreover, she has failed to obtain any type of employment, despite a job offer. She was, however, awarded Social Security Disability benefits shortly before the termination hearing, and although she was unsure of the amount of assistance, she testified she believed it would be between $600 and $900 each month.

Due to the mother's inability to show she could care for N.P., the State petitioned to terminate her parental rights on December 17, 2013. A contested hearing was held on February 11 and 12, 2014, in which the mother and several DHS workers testified. On March 25, the juvenile court terminated the mother's parental rights under Iowa Code section 232.116(1)(f) and (g). The mother appeals.

We review termination proceedings de novo. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999). The grounds for termination must be proved by clear and convincing evidence. *Id.* Our primary concern is the child's best interest. *Id.* When the juvenile court terminates parental rights on more than one statutory ground, we only need find grounds to terminate under one of the sections cited by the juvenile court to affirm. *Id.* To terminate parental rights under Iowa Code section 232.116(1)(g), the State must prove by clear and convincing evidence the child has been adjudicated CINA, the parent's rights to another child were terminated, the parent does not respond to services, and it is clear that an additional period of time would not correct the situation.[6]

The mother does not dispute she has had her rights terminated to five other children, *see In re Courtney S.*, No. 07-1295, 2008 WL 2469885 (Neb. Ct. App. June 17, 2008) (affirming juvenile court's termination of parental rights), and that N.P. was adjudicated CINA. She does, however, contest the finding that she did not respond to services, asserting she complied with the mental health requirements and she remained drug-free. She therefore contends N.P. can be returned to her care. However, it is clear from the history of the case and the mother's involvement with both the Iowa and Nebraska Departments of Human Services that she has failed to adequately take advantage of the many services offered to her. She has not demonstrated she can maintain housing, maintain a

---

[6] To terminate under Iowa Code section 232.116(1)(f), the State must prove by clear and convincing evidence the child is four years of age or older, has been adjudicated CINA, removed from home for twelve of last the last eighteen months, and cannot be returned home.

reliable source of income that will support her and N.P., or consistently address her serious mental health needs.[7]

The juvenile court accurately summed up the mother's situation when it stated:

> During this twenty-five month period, [the mother] has not had a permanent residence, usually living with friends, in a shelter, or in a vehicle. She maintained her own home on two separate occasions, which includes her current residence. The other occasion was for a period of five to six months. Although it is not possible to determine if she will maintain this current residence, if history is a predictor of the future, she will not. The termination of her five children in Nebraska was in part based upon an inability to maintain housing and because of her inability to address her mental health issues. During this case, she has had resources available to her yet she has failed to take advantage of the same. She did obtain disability, however, given the anticipated amount, she is going to continue to struggle financially to support herself let alone both she and [N.P.]. It is clear she suffers from a multitude of mental health issues which she has allowed to go untreated and un-medicated for periods of time throughout this matter. [The mother] disputes suffering from several of the diagnoses relied upon by the social security administration in awarding her disability benefits. It is clear she is not even aware of the extent of her mental health issues . . . . [N.P.] needs stability in his life. [The mother] is not capable of providing this stability at this time or anytime in the near future. She has not been able to adequately care for herself throughout this case.

The record fully supports this assessment.

Furthermore, termination is in N.P.'s best interest. *See* Iowa Code § 232.116(2). Iowa DHS has been involved with the mother and N.P. for two years, and she received services through the Nebraska DHS system from 2004 to 2007. However, despite the lengthy receipt of services, the mother has failed

---

[7] As to her housing, the mother states in her appellate brief dated April 21, 2014, that she "is still residing there today," and "has managed to maintain [the housing] to this day." These assertions are outside the closed record, and therefore we cannot consider them on appeal. *See State v. Weiland*, 202 N.W.2d 67, 69 (Iowa 1972) (noting appellate courts cannot consider facts that are outside of the record).

to maintain suitable housing, seek a steady income or employment, consistently address her mental health needs, and comply with other court-ordered services, such as therapy. In determining the future actions of the parent, her past conduct is instructive. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). It is evident from the mother's conduct that she is unable to provide an acceptable level of care to N.P, and, regardless of how many services she receives, will be unable to do so in the foreseeable future.

It is also clear that more time would not correct the situation, and that it is important for N.P.'s well-being and security that the mother's rights be terminated. "We have repeatedly followed the principle that the statutory time line must be followed and children should not be forced to wait for their parent to grow up." *In re N.F.*, 579, N.W.2d 338, 341 (Iowa Ct. App. 1998); *see also* Iowa Code § 232.116(2). While it is clear the mother and N.P. share a bond, this consideration does not prevent termination. *See* Iowa Code § 232.116(3)(c). The mother has failed to show much—if any—progress in being able to safely parent N.P. in all the years in which she has been receiving services. It is fortunate that N.P. has found stability in his pre-adoptive home. Consequently, we conclude the juvenile court properly terminated the mother's parental rights, and we affirm the court's termination order.

**AFFIRMED.**