# IN THE COURT OF APPEALS OF IOWA

No. 19-1003
Filed September 11, 2019

**IN THE INTEREST OF W.H. and G.H.,**
**Minor Children,**

**S.H., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Story County, Stephen A. Owen, District Associate Judge.

The father appeals the termination of his parental rights to his two children. **AFFIRMED.**

Christopher A. Clausen of Clausen Law Office, Ames, for appellant father.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Shannon M. Leighty of the Public Defender's Office, Nevada, attorney and guardian ad litem for minor children.

Considered by Tabor, P.J., and Mullins and May, JJ.

**MAY, Judge.**

A father appeals the termination of his parental rights to two children, G.H. and W.H. We affirm.

G.H. was born in August 2013. In November 2016, the Iowa Department of Human Services (DHS) became involved with this family due to allegations the mother and father were under the influence of drugs while caring for G.H. G.H. was removed from the parents' custody but later returned to the mother.

In March 2017, W.H. was born. Later that year, both children were removed due to the parents' mental-health and substance-abuse issues. The children were briefly returned to the father's custody in September 2018. However, they were removed after the father's arrest for domestic assault against his girlfriend.

The father continued to struggle with substance abuse. He tested positive for drugs on several occasions, missed multiple tests, and eventually admitted to using marijuana and "overusing" prescription amphetamine.

His involvement with the children dissipated. Between January and July 2019, the father only had one visitation with the children, despite being offered twelve other visitations.

In July 2019, the juvenile court held a termination hearing. The father conceded he lacked his own stable housing. He agreed he was not in a position to take custody of the children.

Ultimately, the juvenile court terminated the mother and father's rights to both children pursuant to Iowa Code section 232.116(1)(e), (f), and (h) (2018). The

father now appeals.[1]  He does not dispute statutory grounds for termination exist under Iowa Code section 232.116(1).  He contends, however, termination is inappropriate under Iowa Code section 232.116(3).  He also raises concerns about the children's continued access to their cultural heritage.  Our review is de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).

The father raises two arguments concerning section 232.116(3).  First, he contends termination is inappropriate because the children are placed with a relative.  Under Iowa Code section 232.116(3)(a), a court may decline to terminate parental rights if "[a] relative has *legal custody* of the child."  (Emphasis added.) Those facts do not exist here.  Although DHS has placed the children in the physical care of the maternal grandmother, no relative has "legal custody."  In its termination order, the juvenile court ordered that DHS "shall continue to act as custodian of the children."  Section 232.116(3)(a) does not apply.  *See In re B.W.*, No. 19-0602, 2019 WL 2375255, at *4 (Iowa Ct. App. June 5, 2019) (declining to apply section 232.116(3)(a) because child remained in DHS's legal custody while placed in a relative's physical care).

The father also argues termination is precluded by his strong bond with the children.  Under Iowa Code section 232.116(3)(c), a court may decline to terminate parental rights if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."  Here, there is certainly evidence the children acknowledge the father is their parent.  Based on our review, however, we agree with the juvenile

---

[1] The mother withdrew her notice of appeal.  Therefore, only the father's appeal is addressed in this opinion.

court that the father has not "developed or maintained the kind of deep and abiding parent-child bond that leads the court to conclude that termination of parental rights would have a detrimental effect on either child." Section 232.116(3)(c) also does not apply.

Finally, the father raises certain racial and cultural concerns. The father self-identifies as African-American and describes the children as biracial. He contends termination of his parental rights will foreclose continued contact "for the children with their ethnic and cultural background" through their father and his family. He suggests we should weigh these concerns much as we would in a case involving the Indian Child Welfare Act (ICWA).[2]

We disagree. ICWA only applies to "child custody proceedings involving an Indian child." Iowa Code § 232B.4(1). We cannot expand ICWA by analogy, as the father proposes. "It is not the function of courts to legislate and [we] are constitutionally prohibited from doing so." *Hansen v. Haugh*, 149 N.W.2d 169, 241 (Iowa 1967) (citing Iowa Const. art. III. § 1).[3]

Instead, our analysis of the children's best interests is governed by Iowa Code section 232.116(2). *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010) (noting "a

---

[2] The Federal ICWA was passed in 1979 and provided "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." *In re J.L.*, 779 N.W.2d 481, 485 (Iowa Ct. App. 2009) (quoting *In re N.N.E.*, 752 N.W.2d 1, 6–7 (Iowa 2008)). Later, Iowa passed its own ICWA with the purpose of "clarify[ing] state policies and procedures regarding implementation of the federal [ICWA]." *See* Iowa Code § 232B.2.

[3] The father also suggests this court should "consider the children's continued contact with their racial and ethnic heritage *in assigning placement*." (Emphasis added.) We disagree. Although we acknowledge the maternal grandmother's interest in adopting the children in this opinion, the children's permanent placement following termination is not before us in this appeal. *In re M.K.*, No. 18-1734, 2019 WL 719172, at *3 (Iowa Ct. App. Feb. 20, 2019).

court should base its best-interest determination on the legislative requirements contained in section 232.116(2), rather than upon the court's own value system"). It states, in pertinent part:

> In considering whether to terminate the rights of a parent . . . , the court shall give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren].

Iowa Code § 232.116(2). By enacting these words, our legislature has "significantly, and not too subtly, identified a child's safety and his or her need for a permanent home as the defining elements in a child's best interests." *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., specially concurring); *see also M.K.*, 2019 WL 719172, at *3 (addressing a father's concern that the child would lose touch with African-American relatives; noting "[w]hen applying the factors in section 232.116(2), we must consider [the child's] safety and whether reunification with [the father] would promote the child's well-being"); *In re B.M.*, No. 99-1455, 2000 WL 504734, at *4 (Iowa Ct. App. Apr. 28, 2000) (addressing an assertion that the juvenile court "erred in underestimating the importance of [the child]'s exposure to the African-American heritage since she was a mixed race child" and noting the juvenile court was correct in determining the child's immediate needs required termination of parental rights).

Applying these principles here, we share the juvenile court's concerns regarding the father's history of domestic violence; his continued struggles with substance-abuse and mental-health issues; and his lack of stability. As he acknowledged at the termination hearing, he was not prepared to take custody of the children. Conversely, termination will free the children to obtain permanency

through adoption by their maternal grandmother. As the juvenile court noted, she has "provided the children with a safe and stable home since September 2018." In short, termination will provide the children both safety and permanency, "defining elements" under the best-interests analysis. *J.E.*, 723 N.W.2d at 802 (Cady, J., specially concurring).

Moreover, the record does not suggest termination will preclude contact between the children and their father's family. The children's DHS social worker testified that, even without her direction, the maternal grandmother has continued to allowed visits with the paternal relatives. "[T]hey have a regular schedule, and the children go to church with [the father's] family, and that is without any direction from me," she testified.

We are satisfied termination is in the children's best interests.

**AFFIRMED**

Mullins, J., concurs; Tabor, P.J., concurs specially.

**TABOR, Presiding Judge** (concurring specially)

Like the majority, I am not prepared to delay permanency for these children based on the father's argument that the factors in Iowa Code section 232.116(3)(a) and (c) weigh against termination of his parental rights. Like the majority, I am concerned by the father's dwindling participation in visits with his children. I also agree with the majority that it is not our job to legislate.

But I write separately to emphasize that courts do have a role in overseeing the State's reasonable efforts to reunify families. *See In re L.T.*, 924 N.W.2d 521, 529–30 (Iowa 2019) (Cady, C.J., concurring specially) (reiterating the department of human services's (DHS) responsibility "to deliver reasonable efforts toward reunification where statutorily required or otherwise in the child's best interests"). And scholars have persuasively argued reasonable efforts require culturally competent services. *See* Nell Clement, *Do "Reasonable Efforts" Require Cultural Competence? The Importance of Culturally Competent Reunification Services in the California Child Welfare System*, 5 Hastings Race & Poverty L.J. 397, 422 (2008). So I would not as quickly dismiss the importance of ethnic and cultural contact in considering the children's best interests throughout the child-in-need-of-assistance and termination proceedings.

As the father suggests, marked similarities exist between African-American children and families in today's child welfare system and Native American children and families who are protected by Indian Child Welfare Act. An expert in the field summarized the comparison:

> African-American children are disproportionality overrepresented in the child welfare and foster care system. While this has a direct impact on the health and welfare of African-American children, it also necessarily has a grave impact on the existence and state of African-American families. The impact is similar to the state of Indian children and Indian families prior to the passage of the Indian Child Welfare Act, where the rate of outplacements for Native American children far outpaced the number of Native American children in the general population. Currently African-American children comprise less than one-fifth of the nation's children, yet they represent nearly half of the national foster care population.

Stephanie Smith Ledesma, *The Vanishing of the African-American Family: "Reasonable Efforts" and Its Connection to the Disproportionality of the Child Welfare System*, 9 Charleston L. Rev. 29, 34 (2014); *see also* Cynthia G. Hawkins-León, *The Indian Child Welfare Act and the African American Tribe: Facing the Adoption Crisis*, 36 Brandeis J. Fam. L. 201, 213 (1997) ("The figures for displaced or outplaced African American children are almost as high as those figures reported for Native American children in the 1970's.").

The overrepresentation data in Iowa is just as distressing as the national numbers. The rate of African-American children entering foster care in Iowa in 2017 was 1.92 times greater than their proportion of our state's general population.[4]

Here, the father does not argue the DHS failed to make reasonable efforts toward reunification, and the children's placement is not before us. Thus, I agree

---

[4] Puzzanchera, C. and Taylor, M., *Disproportionality Rates for Children of Color in Foster Care Dashboard (National Council of Juvenile and Family Court Judges)* (2019) http://www.ncjj.org/AFCARS/Disproportionality_Rates_for_Children_of_Color.aspx (last visited September 9, 2019) (featuring interactive dashboard with calculation of disproportionality rates for all states using the child population by race from the Census Bureau and the number of children entering foster care based on the National Data Archive on Child Abuse and Neglect's Adoption and Foster Care Analysis and Reporting System).

with the majority that the father's appeal does not offer a means to address his concern about the children's access to their cultural heritage.