# IN THE COURT OF APPEALS OF IOWA

No. 15-0503
Filed May 20, 2015

**IN THE INTEREST OF M.B. AND S.B.,**
**Minor Children,**

**A.B., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Cherokee County, Mary L. Timko, Associate Juvenile Judge.

The mother appeals the juvenile court's termination of her parental rights to her children, M.B. and S.B. **AFFIRMED.**

John M. Loughlin of Loughlin Law Firm, Cherokee, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, Ryan Kolpin, County Attorney, and Kristal Phillips, Assistant County Attorney, for appellee State.

Lesley Rynell of State Public Defender, Sioux City, attorney and guardian ad litem for minor children.

Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**VOGEL, P.J.**

The mother appeals the juvenile court's termination of her parental rights to her young girls, M.B. and S.B. She asserts the court erred when finding the Iowa Department of Human Services (DHS) made reasonable efforts to reunite her with her children and in denying her request for a six-month extension. She further argues grounds to terminate her parental rights under Iowa Code section 232.116(1)(d), (h), and (i) (2013) were not proved and termination was not in the children's best interests. We conclude the mother did not preserve error on her claim reasonable efforts were not made. Additionally, given her lack of progress, the juvenile court properly denied her request for a six-month extension. Due to this lack of progress and demonstrated inability to safely care for the children, the court also properly terminated her rights under paragraphs (h) and (i). Finally, the children—particularly S.B.—do not share a bond with the mother, and combined with the mother's inability to adequately and safely care for the children, it is in their best interests her rights be terminated. Consequently, we affirm the order of the juvenile court.

**I. Factual and Procedural Background**

S.B., born September 2011, and M.B., born July 2013, first came to the attention of the DHS on October 7, 2013. The mother was failing to care for S.B., leaving her in her room with a baby gate blocking the door, and only letting her out for meals. The mother interacted very minimally with S.B. and only occasionally changed her diaper. As a consequence, S.B.'s speech, physical,

and behavioral development was significantly delayed.[1]  The mother was informed by the DHS worker she needed to provide better care for S.B., including interacting with her and changing her diaper on a regular basis.  The children remained in the mother's care.

The mother was receiving services from the Area Education Agency (AEA), but cancelled them after the DHS worker left her apartment on October 7.  The DHS worker made three unannounced visits and one scheduled visit between this time and November 2013.  At each unannounced visit, the DHS worker observed that S.B. was not being cared for, as she remained in the bedroom behind the baby gate and had a full diaper.

On November 4, 2013, a CPS investigation was initiated due to DHS receiving a report the mother had sent a picture of S.B. wearing only her underwear to the man with whom she was currently having sexual relations.[2]  The mother stated she knew this photograph would be used for this man's sexual gratification.  She further informed DHS that they had met online in September 2013 and that he would come to her apartment, they would watch a movie, and then engage in sexual intercourse.  The girls were present in the home when this occurred, though the mother stated they were in their bedrooms.

Due to the lack of care and the danger of sexual abuse, the children were removed from the mother's care on November 12.  They were placed in foster

---

[1] While in the care of the foster home, where she was receiving speech and other therapy, S.B. improved in both her health and cognitive abilities.  The foster father also testified that when M.B. arrived in the home, though four months old, she was like a newborn with respect to her muscle development; however, with the foster family's care, as of the termination hearing she was developmentally on track.

[2] She informed DHS that someone online had told her this man was Cody Schmitt, a registered sex offender.

care.[3] The mother was granted three supervised visits each week, which she consistently attended. However, she would interact only minimally with S.B., and it was clear to the DHS worker they did not share a bond. It was further noted that the mother had no ability to give both children the attention and care they needed. She also required prompting during visits to respond appropriately to the children's needs, though when questioned at the review and termination hearings, the mother stated she believed she was able to parent both children adequately. Visits with S.B. were temporarily halted in July 2014, according to the recommendation of S.B.'s nurse practitioner who provided therapy to S.B., as she wanted to explore whether S.B.'s behavioral and speech problems were due to her contact with the mother. In November the mother and S.B. began attending parent-child interaction therapy (PCIT) appointments together.

DHS workers were also concerned with the mother's extremely inappropriate use of social media to attract men who presented a danger to the children, as two of the men expressed interest of a sexual nature in the girls. The mother continued to use these sites despite being warned of the danger and dysfunction she was creating. Among the exhibits entered into evidence were photographs the mother sent to men of S.B. with only her diaper on, a print off from an Instagram account showing the mother with a man—posted thirteen weeks before the termination hearing—as well as an earlier text message

---

[3] The children were in two foster homes before the third foster home took them in, which is where they remained at the time of the termination hearing. In its opinion, the court indicated the reason for the rapid change of foster homes was due to the difficulty in caring for the children's special needs.

exchange where a man requested to have sex with M.B., who was three months old at the time.

As of the date of the termination hearing, the mother was unemployed and receiving disability. Her grandmother is her legal guardian and is responsible for handling the mother's money. The mother has stable housing and, at the time of the termination hearing, was living in the same two-bedroom apartment in which she was residing when the children were removed. Additionally, she is married, but her husband is currently in prison due to a conviction for sexual abuse. Though he is the children's legal father, he is not their biological father.[4]

The mother received the following services throughout the pendency of this proceeding: individual counseling; family safety, risk, and permanency services; supervised visitation; PCIT services; AEA services; and psychological testing.[5] Due to the mother's lower cognitive functioning, the services were tailored to match her abilities.

Because of the mother's lack of improvement with regard to her ability to safely and adequately parent the children, the State filed a petition to terminate her parental rights on July 23, 2014. Attached was an affidavit from the DHS caseworker attesting to the difficulty the mother had in regard to interacting with and caring for the children and her opinion that the children could not be returned to the mother's care. A contested termination hearing was held on December 15, 2014, and January 20, 2015, in which the mother personally appeared and

---

[4] Though paternity testing had been conducted on several men, whom the mother believed could be the children's father, the actual biological father of each child remains unknown.
[5] These tests diagnosed the mother with mild mental retardation.

testified. Her therapist testified as well and stated the mother should be granted an additional six months to work towards reunification. On March 12, 2015, the juvenile court entered an order terminating the mother's parental rights to both children pursuant to Iowa Code section 232.116(1)(d), (h), and (i). The mother appeals.

## II. Standard of Review

We review termination proceedings de novo. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999). The grounds for termination must be proved by clear and convincing evidence. *Id.* Our primary concern is the child's best interest. *Id.* When the juvenile court terminates parental rights on more than one statutory ground, we only need find grounds to terminate under one of the sections cited by the juvenile court to affirm. *Id.*

To terminate the mother's parental rights pursuant to Iowa Code section 232.116(1)(h), the State must establish the children are three years old or younger, have been adjudicated children in need of assistance, have been removed from the home for six of the last twelve months, and the children cannot be returned to the mother's care. *See* Iowa Code § 232.116(1)(h)(1)–(4). Under paragraph (i), the State must prove the children meet the definition of CINA due to a finding of physical abuse or neglect because of the acts or omissions of the mother, there is clear and convincing evidence the abuse or neglect posed a significant risk to the children's lives or constituted imminent danger, and the offer or receipt of services would not correct the situation within a reasonable period of time. *See id.* § 232.116(1)(i)(1)–(3).

**III. Reasonable Efforts and Six-Month Extension**

The mother first asserts reasonable efforts to reunite her with the children were not made. Specifically, she cites the fact visits with S.B. were temporarily discontinued from July to November 2014, and that resulted in a lack of a bond with S.B. She further argues the juvenile court should have granted her a six-month extension to work towards reunification, asserting she was making progress with the case goals and was confident she could parent the children within the next six months.

As an initial matter, although the mother did object to the suspended visits, she did not otherwise preserve error on her reasonable-efforts claim. Throughout this case, the mother indicated further services were not needed and that she believed she was progressing well and could adequately care for the children. This is contrary to her position at the termination hearing and on appeal, in which she requested a "bonding assessment." Moreover, the testimony was clear that any lack of bond with S.B. long pre-dated the temporary suspension of visits. Furthermore, we note it is the parent's responsibility to request additional services prior to the termination hearing. *See In re H.L.B.R.*, 567 N.W.2d 675, 679 (Iowa Ct. App. 1997). It is clear the mother did not do so; rather, she failed to pursue additional services and only participated in services when told to do so by DHS. Consequently, we conclude she did not preserve error with regard to her reasonable-efforts claim. *See In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 2005) (holding the parents did not preserve error on the reasonable-efforts issue because they did not request additional services).

As to the request for a six-month extension, the juvenile court stated:

Upon examination of the record, past and present, the court cannot find that the need for removal would no longer exist after a six-month extension. [S.B. and M.B.] have already been out of the home for over twelve months at the time the termination of parental rights/permanency hearing was held . . . . [The mother's] lack of insight into the reasons that led to the removal in the first place, her inability to follow some of the most basic tenets for safe parenting, her continued involvement with inappropriate males and her inability to set boundaries with them, as well as the substantial progress in physical, emotional and developmental areas of [S.B. and M.B.'s] life and the lack of a parent/child bond between [the mother] and the girls all mitigate against a finding that another six months would eliminate the need for the children's removal. It would be cruel to return the children to an environment that has not changed and a mother who cannot consistently provide for the safety of her children despite the efforts provided by the Department of Human Services, efforts that have gone beyond reasonable, to address the myriad of issues present in this case from the beginning to now. Additionally, it would be cruel to make these children wait another six months just to see "if" [the mother] could somehow put herself in a position to have the children returned to her care.

The record supports this conclusion. The mother has had extensive services from DHS and she has made little to no progress; instead of internalizing the information she merely repeats back what she has been told. Exhibits also demonstrated that, until shortly before the termination hearing, she remained in contact with men who presented an imminent danger to the children as sexual predators. Although her therapist was supportive of a six-month extension, the therapist testified the mother had not revealed her associations with inappropriate men or the contact they had had with the children. She further testified she was only concerned with the best interests of the mother, not the affected children. It is clear that, due to the mother's lack of progress—despite the receipt of many services from the time of removal until the termination hearing—the mother would not be fit to care for her children in another six

months' time. Moreover: "We have repeatedly followed the principle that the statutory time line must be followed and children should not be forced to wait for their parent to grow up." *In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998); *see also* Iowa Code § 232.116(2). Consequently, the juvenile court properly denied the mother's request for a six-month extension. *See* Iowa Code § 232.104(2)(b).

**IV. Termination and Best Interests**

The mother also argues the State did not prove by clear and convincing evidence her rights should be terminated, because she believes she can now adequately parent the children. She relies on her testimony that she is no longer dating men, has learned about boundaries, and has also been taught how to properly care for the children. She further asserts termination is not in their best interests.

We do not agree with the mother's arguments, as the evidence demonstrates the children would suffer from abuse or neglect and be in imminent danger if returned to the mother's care, within the meaning of Iowa Code section 232.116(1)(h) and (i). At the termination hearing, the DHS worker testified in the following manner:

> [The mother] has received an array of services to address the concerns that led to the department's involvement, yet concerns still exist today. [The mother] is not honest and [was] secretive about her behaviors throughout this case, she's had multiple male partners with extensive criminal histories, and I believe you know, she hasn't exposed the children to these people over the last year due to having supervised visits, but I believe if the children were in [the mother's] care, due to her actions and continued relationships, that the children would continue to be exposed to males who have extensive criminal histories and that they don't know.

The record establishes that the DHS worker's characterization of the mother's paramours as having "extensive criminal histories" is a charitable description. Several of the men are sex offenders who have demonstrated their willingness to re-victimize by requesting the mother send them the children's clothing, pictures where S.B. was only partially clothed, and requesting to have sex with M.B. Nonetheless, the mother continues to associate with these men and others who present a similar danger to the children. Her acquiescence in their requests for pictures and clothing items underscores the mother's total incomprehension of the danger she poses to her children, that is, the imminent danger of sexual abuse created by the mother's continued association with her choice of men. *See* Iowa Code § 232.116(1)(i)(2).

Nor does the mother have insight into how her actions and lack of care affect the children. As the juvenile court noted:

> It is not clear that [the mother] has real insight beyond parroting back what she has been told in therapy about "boundaries" and how to protect her children. [The mother] does not seem to grasp the reasons why her children were removed from her care despite the fact that she was told over and over. The most that [the mother] can state is that the children were removed because of all her relationships and the picture sending. She was able to state that the children were exposed to relationships that she did not know would end quickly. This is clearly one of the reasons that the children were removed and never returned; however, [the mother] does not seem to understand that her parenting skills were woefully lacking, which led to the significant delays in all areas of their development.

Among the supporting evidence for this statement was the fact the mother could not care for both children at the same time and had difficulty parenting them even when prompted by DHS workers during supervised visits. S.B.'s significant delays both mentally and physically also demonstrate the mother's

inability to care for one child, let alone two. It is further concerning the mother was unable to respond to the State's question as to why the men with whom she associated would present a danger to the children, other than saying the men did not respect her boundaries. In determining the future actions of the parent, her past conduct is instructive. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). Given these circumstances, combined with the mother's lack of insight and progress, it is clear the children cannot be returned to the mother's care within the meaning of paragraphs (h) and (i).

Furthermore, it is in the children's best interests the mother's rights be terminated. There is no evidence of a bond between the mother and S.B.—S.B. does not acknowledge the mother or appear to know her when they are in the same room. Though the mother interacted more with M.B. during the visits, she nonetheless was unable to recognize clues as to M.B.'s needs; additionally, she has not had visitation—only PCIT appointments—with S.B. since July 2014 and has not progressed beyond fully-supervised visits with M.B. The lack of a bond, combined with the danger of neglect and potential sexual abuse by the men with whom the mother continues to interact, indicates that it is in the children's best interests the mother's rights be terminated. Particularly due to their young age, they are also in need of permanency. *See* Iowa Code § 232.116(2). Consequently, we affirm the order of the juvenile court terminating the mother's parental rights.

**AFFIRMED.**