# IN THE COURT OF APPEALS OF IOWA

No. 20-1727
Filed April 14, 2021

IN THE INTEREST OF Z.D.,
Minor Child,

B.M., Mother,
    Appellant.
_____

Appeal from the Iowa District Court for Warren County, Brendan Greiner, District Associate Judge.

The mother appeals the termination of her parental rights to her child. **AFFIRMED.**

Tara M. Elcock of Elcock Law Firm, PLC, Indianola, for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant Attorney General, for appellee State.

Magdalena Reese of Des Moines Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., Schumacher, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**POTTERFIELD, Senior Judge.**

The mother appeals the termination of her parental rights to her child, Z.D., who was born in 2015.[1] The juvenile court terminated the mother's rights pursuant to Iowa Code section 232.116(1)(f) (2020). On appeal, she contends the Iowa Department of Human services (DHS) failed to make reasonable efforts to reunify her with Z.D. so she should get additional time with requested services to work toward reunification. She also maintains termination of her rights is not in Z.D.'s best interests and raises multiple evidentiary challenges.

**I. Background Facts and Proceedings.**

DHS became involved with the family this time in March 2019,[2] after the mother went to the emergency room following a party at her home where she was drinking alcohol, ingesting drugs, and got into a physical altercation with a man. Z.D. was in the home at the time. At the hospital, the mother tested positive for methamphetamine, which she denied knowingly taking, but she admitted letting a male friend inside her home with methamphetamine and heroin and taking prescription medication not prescribed to her. When the mother stated she did not feel able to continue caring for Z.D., Z.D. was immediately removed from the mother's care and placed with her maternal grandmother and step-grandfather, who for years had often been the informal caretakers of Z.D.

---

[1] The father's parental rights were also terminated. He does not appeal.
[2] We have only general information about other DHS involvement with this family, such as statements that the family has been involved in "prior assessments" with Z.D. being identified as the victim. In a police report in the record, there is also a mention of prior assessments from DHS on the mother, the father, and the maternal grandparents.

In spite of her initial denial of intentionally taking methamphetamine, a few weeks later, the mother admitted she was "trying drugs" the night before she went to the emergency room. The mother also admitted to struggling with her mental health. Around the same time, the mother moved to Nebraska to live with her boyfriend, Matt M. She wanted Z.D.'s case transferred because she did not intend to move back to Iowa.

The mother reported to the DHS social worker that Z.D. used to have pica[3] and would eat shoes, her wooden crib, and rocks. Possibly as a result of this, Z.D. required extensive dental surgery in May 2019, which included extracting two teeth, capping or filling seven others, and completing a root canal.

In late May, the social worker visited the grandparents' home and reported that though the home was two stories, the grandparents told her they do not use the upstairs as there was a "fire bomb" thrown in about ten years ago and they feared it could happen again. As a result, the grandparents, their minor child, and Z.D. slept on the main floor, with the grandparents using the only bedroom, their child sleeping on a bed in the walkway to the dining room, and Z.D. sleeping on the couch.

Z.D. was removed from the maternal grandparents' care a few days later— in early June. While she was being driven from the grandparents' home, Z.D. ate part of a napkin and some cardboard packaging from a toy she was given. She also immediately began referring to the DHS workers present as "Mommy" and

---

[3] "Pica" is "an abnormal desire to eat substances (such as chalk or ashes) not normally eaten." *Pica*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/pica (last visited Mar. 9, 2021).

"Daddy" despite having met the woman only once and never meeting the man before then.

Z.D. spent only six days at her first foster home. The foster home had three other children, and Z.D. asked the two sons to pull down their pants and go to the bathroom on the basement floor. She also asked to watch the adults shower and asked them to watch her shower and use the toilet. Z.D. chewed on her wooden bed at night and ripped books apart to eat the binding. Additionally, Z.D. asked the foster mother if she could make a video for the mother, in which Z.D. said, "Her has two dogs and I'll miss you but I don't want you pull your pants down so." Despite being there only a short time, Z.D. referred to the foster parents as "Mommy" and "Daddy." Due to her interactions with the sons, the foster family was unable to maintain Z.D. in their home.

Z.D. was placed at her second foster home on June 11, 2019. This family did not have any other children, and Z.D. remained in their care at the time of the termination hearing in October 2020. Early on, Z.D. drew a picture and reported it was of "mommy's private parts." She also asked the foster mother to watch her shower and use the toilet; when asked if she needed help with those things, Z.D. said she did not need help but she wanted to be watched. According to the DHS caseworker's June 2019 report to the court, the foster father reported to DHS that he believed Z.D. disliked the mother's boyfriend because Z.D. would grunt annoyingly when the mother put him on the phone during their nightly calls.

Following the July dispositional review hearing, the court filed a separate order finding "by clear and convincing evidence that [Z.D.] is a victim of either sexual or physical abuse" and ordering DHS to "arrange for and pay for a forensic

interview of" Z.D. The State, with DHS and Z.D.'s guardian ad litem, asked the court to reconsider, noting while Z.D. had concerning behaviors, a forensic interview could be premature since she had made no allegations or statements of abuse. They maintained Z.D. should receive therapy and a forensic interview later, if and when she disclosed abuse. The court denied the motion and ordered DHS to make a referral to law enforcement to begin a child-abuse investigation, make a referral for a forensic interview at a child protection center, and report findings to the court before the next hearing.

In late July, it was decided the mother's boyfriend, Matt M., would no longer be allowed to attend visits with the mother.

In August, the foster mother reported that while sitting at the breakfast table, Z.D. said, "I went to the bathroom and Matt peed on me and I got all wet."

The mother and Matt M. moved to Iowa in October, to a town approximately thirty minutes from Z.D.'s placement. Supervised visits then began taking place in their home without Matt M. present.

Z.D.'s therapist wrote a letter to DHS on November 1, 2019, in anticipation of the scheduled November dispositional review hearing. The therapist, Gayle Murray, reported seeing Z.D. ten times, "typically for individual play therapy" and noted the mother accompanied Z.D. for the initial assessment and one other session. Murray said Z.D. "ha[d] not been able to address any victimization directly in therapy nor reportedly in her forensic interview" but that her "symbolic play ha[d] included themes that are often present with sexual abuse." Murray expressed concern that the mother was not taking responsibility for the way her parenting had negatively affected Z.D. and noted the mother "ha[d] identified multiple people from

their lives who have sexual abuse 'potential' and identified that [Z.D.] had sexually reactive behaviors as young as 2 years old." Also, the foster mother reported to DHS that they had not seen any instances of Z.D. eating non-food items until November 1, when Z.D. started eating play dough while on the phone with the mother and Matt M. After the call ended, when the foster mother asked Z.D. why she ate play dough, Z.D. responded, "Because I wanted to make my mom mad."

Also in November, as part of the law enforcement investigation initiated by the juvenile court's order, the mother spoke with a detective. The mother reported that Z.D. first started exhibiting odd behaviors after she got Z.D. back from an extended stay with the father[4] when Z.D. was two years old. She reported Z.D. would "hump" stuff and, on one occasion, took a hot dog and rubbed it on her vaginal area outside of her clothing. During the same discussion, the mother named Matt W. as a former boyfriend and the man who brought drugs to her party in March 2019—the incident that began DHS's involvement with the family. She told the detective Matt W. had been alone with Z.D. "up to four times." She also told the detective her current boyfriend, Matt M., had never been alone with Z.D. The mother denied knowing Z.D. claimed "Matt peed on [her]."

Following the November hearing, the court confirmed Z.D.'s continued removal and stated the mother needed to "acknowledge how her life choices [have]

---

[4] The mother and father did not have a formal custody or visitation agreement. According to the mother, for the first couple years of Z.D.'s life, the father would sometimes take Z.D. and refuse to give her back for a couple months. The mother stated this stopped when Z.D. was two years old. After that, Z.D. spent much of her time living with her grandparents in an informal arrangement between the mother and maternal grandparents.

affected [Z.D.] and show how she is going to change her life to provide a safe home for [Z.D.]."

Although it was a concern and a recommendation from the beginning of the case, the mother did not begin engaging in mental-health therapy until December 2019. She attended two sessions before deciding to switch providers, which led to a lapse in therapy until March 2020.

In a February 2020 letter to DHS, Z.D.'s therapist said she saw signs of "therapeutic growth" in Z.D.'s play and Z.D. "continue[d] to make behavioral and emotional progress." However, she also noted, "There continue to be incidents of sexually reactive behavior where [Z.D.] is focused on kissing peers, being married, or being naked at an atypical time." She also mentioned speaking with one of the therapists the mother had seen and shared a report that the mother "talked of being concerned that [Z.D.] will get the wrong person in trouble" rather than focusing her concern on what had happened to Z.D. Murray also reported the mother

> indicated this new therapist is the third one she has been to and the one she signed the release for she had only seen 2 or 3 times. The therapeutic work required for her to be considered safe, healthy and protective will be intense and extensive, not just a few sessions.

In a February report to the court, the court-appointed special advocate (CASA) detailed that while she was visiting Z.D. at the foster family's home in January, she observed the mother call to speak with Z.D. on the phone. According to the CASA, the phone call lasted only approximately three minutes; immediately after greetings, Z.D. asked the mother where she was, and the mother said she was at "Matt's Mom's house." Z.D. then changed the subject before abruptly hanging up the phone on her mother.

In early March, the mother began participating in mental-health therapy with Catherine Stack regularly. She was advised to have weekly appointments.

According to the social worker's March report, the mother asked if then-fiancé Matt M. could start attending her visits with Z.D. When the worker would not allow it and explained Z.D. had disclosed Matt "peed" on her, the mother stated it was a different Matt who did that. Additionally, the mother claimed Z.D. knew Matt M. as "dad" and that not allowing Z.D. and Matt M. to see each other was hurting them both. Z.D.'s therapist also reported being contacted by the mother several times with the focus on how to move forward and include Matt M. in her visits with Z.D.

At the March hearing, the DHS worker asked the court to grant a six-month extension and to adopt the recommendations that the mother "participate in individual therapy and follow all recommendations." The court did so, delaying permanency for six months and finding Z.D. would no longer need to be removed from the mother's care if the mother "address[ed] her mental health and substance abuse issues, provid[ed] a safe, stable home for the child and acknowledg[ed] and address[ed] her parenting of [Z.D.] and how it affect[ed] her."

In April, the mother announced she was pregnant with Matt M.'s child.

Stack, the mother's therapist, provided a letter in May regarding the mother's treatment at DHS's request. The mother had nine sessions since finishing her intake appointments on March 10. She was diagnosed with post-traumatic stress disorder and major depressive disorder and was working on "overall mental health, self-care and coping skills, trauma recovery, and parenting."

The therapist opined that the mother was "active and engaged" and "making progress in treatment."

In her June report, the CASA wrote about a March visit with Z.D. when Z.D. "brought a handful of pictures that she had received from her mother" to show the CASA. Z.D. showed the CASA just the top picture, which was one of her and her mother. She became frustrated with requests to see the others and would not share them. Later, when the foster parents asked Z.D. if she would share her photos with the CASA, Z.D. shared the others as well. The CASA noted the other nine images were of or included Matt M. The CASA also described a video call between Z.D. and the mother that the CASA watched. According to the CASA, the call lasted less than fifteen minutes, and Z.D. asked to be allowed to end it "no less than five times. . . . At one point during the call, Z.D. broke down into tears begging to end the call." The CASA noted the requests to end the call began after Z.D. asked her mother where she was, and the mother replied she was at Matt's house.

In a June letter Z.D.'s therapist, outlined the following:

> [Z.D.] continues to utilize play therapy very productively. At the very first appointment, [Z.D.] asked her mom "Why did Matt pull his pants down at me?" At a play therapy session in January, [Z.D.], as the mom, reported "my honey did it, I told him to stop" about touching the baby inappropriately. She reported he also "spanks her bottom." In February she had some incidents of sexually reactive behaviors such as kissing a boy on the lips at school and rolling around naked on a blanket in front of a babysitter saying "oh it feels so good." At a session in April, [Z.D.] had the largest member of a family aggress at all the others, repeatedly injuring them. She then introduced pictures her mom had sent to her and played games with them. She eventually was using them to play slap jack and would repeatedly slap and aggress at the pictures of Matt [M]. She intentionally singled out those of Matt and would hug the picture if she accidentally hit her mom. She then began jumping on them, running and jumping on them, sitting on them and pretending to fart on them and almost tearing them up. The rest of the session, her body was

very dysregulated, with flopping around, kicking at [the foster mother] and tripping and falling. When [the mother] and Matt [M.] came to therapy, they suggested there was a Matt in [the mother's] life before him who was likely the person [Z.D.] is bringing up.

She also responded to the mother's therapist's recommendation of "child-parent psychotherapy . . . to work on dyadic trauma recovery and relationship patterns," urging that if the court were to order Z.D. and the mother to participate in such therapy together, "it is imperative the therapist has expertise in the area of sexual abuse so they are able to 'see and hear' the communications that [Z.D.] may be trying to express through the modality of play therapy and help [the mother] understand them and not minimize or deny the communications."

The court's June CINA permanency review order reiterated its March findings and scheduled a permanency review hearing on September 9.

In a July report by the worker in charge of supervising visits, the worker detailed that she and the mother

discussed the relationship between her and Matt [M.] and how it is affecting certain areas of the case. [The mother] expressed that she has even spoken with Matt regarding the relationship ending so [Z.D.] can come home. [The mother] expressed that it isn't fair that Matt is being accused of something that he didn't do and feels he has to agree to doing the actions to make this all go away and that isn't fair. Worker responded that she understands the frustration with the situation. Worker and [the mother] discussed where DHS believes that [the mother] is picking Matt over [Z.D.] [The mother] expressed that is not the situation that she doesn't feel that it is fair that Matt being accused of something he didn't do is fair.

In August, the mother married Matt M.

In the caseworker's August report to the court, she outlined how the mother struggled to show she had protective capacities with Z.D., stating:

[The mother] was slow to engage in services at the beginning of the case and hasn't fully understood her role in what has happened to

[Z.D.] [The mother] has mentioned believing [the father] has abused [Z.D.] when she was younger but failed to report any concerns at that time. [The mother] has also reported allowing a "friend," [Matt W.], to babysit [Z.D.] even when he had an extensive criminal background. [The mother] has since reported [Matt W.] was the one who allegedly drugged her at the beginning of this case. [She] also willingly left [Z.D.] in the home with her mother and step-father. Her step-father had previously been on the sex offender registry. [The mother] has also reported her now husband, [Matt M.] is very close with [Z.D.] and was never alone with [Z.D.] so he would not have had the opportunity to abuse [her]. [The mother] and [Matt M.] started dating at the beginning of this case and [Z.D.] has been removed from [the mother's] care since. [Matt M.] had minimal interactions with [Z.D.] at the beginning of the case and has since not had any contact with [her]. [The mother] has stated [Z.D.] sees [Matt M.] as her father and yearns for a relationship with him but [Z.D.] has had very minimal interactions with [Matt M].

Z.D.'s therapist provided a written update on September 2. In it, she noted the mother asked how she can prove she will be protective of Z.D., to which the therapist pointed out the mother had recently claimed Z.D. did not exhibit sexually reactive behaviors until after she was removed from the grandparents' home but that was contrary to the history the mother herself had provided by telling the therapist Z.D. began acting out sexually at age two after the mother took her back from the father. Additionally, Z.D.'s therapist provided notes from the intake information the mother provided when Z.D. began therapy in summer 2019, at which time the therapist wrote, "[The mother] is currently dating Matt whom she indicated [Z.D.] refers to as dad. She reported they dated originally when [Z.D.] was 2 years old for about 5 months. In February [2019] they decided to get back together."

On September 8, the mother filed a "motion for reasonable efforts and for an expert consultation and witness." In it, the mother was disparaging of the efforts made by DHS and the role she perceived Z.D.'s therapist was allowed to have in

the decisions that were made regarding unsupervised visitation and family therapy. Additionally, she stated:

> [Z.D.'s therapist] states that because [the mother] denies it [is] possible for her husband [Matt M.] to have abused [Z.D.] as her protecting her husband rather than [Z.D.]; truth is, she is saying it is not possible because he has not been alone with [Z.D.] since [Z.D.'s] removal and has, in-fact, only been around her for a total of a few hours, and never before removal.

She asked for "return of custody" of Z.D., or, in the alternative, "an expansion of their visitation" with Z.D., with the help of a reunification therapist and a trial period at home. She also asked for family reunification therapy and "comprehensive review of the case documentation by an expert" with the expert "allowed to be consulted, potentially testify, and that the state pay the costs for the same." The motion was heard at the permanency review hearing the next day, and both the State and GAL resisted it and asked the court to deny the motion.

In its written order, the court concluded that, eighteen months into the proceedings, "[The mother] has not taken accountability how her lack of protective capacities put [Z.D.] in unsafe situations. [She] continues to focus on protecting her husband as opposed to finding out what happened to [Z.D.] She has put [Z.D.] in direct risk by utilizing unsafe caregivers." The court ordered the permanency goal to be changed to termination of parental rights and, because of that, found "no reason to order additional reasonable efforts for reunification with respect to either parent." The same day, the State filed a petition to terminate the mother's parental rights.

The termination hearing took place over two days: October 9 and 20. At the hearing, a DHS worker[5] testified as to recent disclosures Z.D. made regarding sexual abuse. The worker met with Z.D. at her school on September 3, and Z.D. told the worker about how she was going to teach the foster parents' nephew how to play doctor. Z.D. told the worker "Matt" had taught her about playing doctor and that she had played it with him previously. According to the worker's testimony, Z.D. told the worker Matt taught her that you check your ears, eyes, nose, bodies, and then privates.[6] She described this happening twice, and detailed that he wanted her to rub his private, which she did until he told her to stop, and then he took over rubbing his private. The second time they played doctor, Matt used his hand to touch her private (Z.D. pointed at her vaginal area) before having her remove her underwear, and then he used his private to rub on top of her private area while he was laying over top of her. After she finished speaking with Z.D., the worker contacted her DHS colleagues and reported what Z.D. had said. Only then did the worker learn there was a question regarding the identity of Matt.

The same DHS worker met with Z.D. again on September 23. A video recording of the second meeting was introduced into evidence at the termination

---

[5] Not the family's ongoing caseworker; this DHS worker was assigned to investigate after DHS received an allegation the foster parents failed to properly supervise and denied Z.D. critical care by leaving her unsupervised with their four-year-old nephew for a few minutes, which led to the children touching each other inappropriately. The assessment was "unconfirmed" after the DHS worker determined the children removed their pants, but not their underwear, and did not touch each other. Additionally, she concluded the foster parents did not place Z.D. at risk of harm or fail to provide supervision that a reasonable or prudent person would exercise.

[6] The worker reported Z.D. only shared this information after asking many questions about why the worker was writing things down, if she worked "at the police," and if the worker would be telling the mother what she said.

hearing. It showed the worker ask Z.D. to clarify which person taught her about playing doctor, and Z.D. stated, "Matt." The worker then told Z.D. she was confused because she learned Z.D. knows "a couple different people named Matt," to which Z.D. agreed. The worker said, "Okay, so that's why I was confused; I don't know who Matt is." Z.D. told her, "It's my mom's—my mommy's married with Matt." When the worker repeated, "Mommy's married with Matt?" Z.D. said, "Yeah." A little bit later, the worker again asked Z.D., "You talked to me about how Matt told you about doctor. Which Matt was that?" Z.D. answered, "Mommy's Matt."

The mother called three of the service providers who worked with the family to testify on her behalf. They each testified they witnessed the mother have positive interactions with Z.D. during visits and generally thought the case should have progressed further—with the mother getting at least unsupervised time with Z.D.—based on what they saw.

The mother testified at the hearing as well. She stated she was drugged on the night before she went to the emergency room and that she only made statements she voluntarily took drugs because she was told she needed to "own up" to her drug use. She detailed Matt W. telling her he was "going to slit [her] effing throat" if she did not take drugs with him before apparently drugging her drink while she was not looking. She also stated she dated Matt W. for a few months before deciding they were better as friends. During the "friends" period, in December 2018 and January 2019, Matt W. babysat Z.D. at the mother's request.

The mother testified she did not begin dating Matt M. until February 24, 2019, and said he did not meet Z.D. until "after she had been taken. It was Easter."

She denied telling Z.D.'s therapist she previously dated Matt M. when Z.D. was two years old, claiming the therapist must have confused her statements about her prior relationship with Matt W. According to the mother's testimony, Matt M. was around Z.D. only a handful of times and never alone; she said he was allowed to attend three or four of her supervised visits with Z.D. early on in the case and the two of them took Z.D. to his grandmother's home and then his parents' home on back to back days in April 2019 for Easter celebrations with family.

The mother moved to admit "Matt [W.] Facebook post" as an exhibit, and the State and GAL objected. The court sustained the objection. The mother also moved to admit an exhibit containing side-by-side pictures of Matt W. and her husband, Matt M., to show how "very similar" the two men look. This exhibit was admitted at trial. The mother asserted the photos were important because Matt M. never had "ability or time alone with" Z.D. so someone else must have been the perpetrator of sexual abuse upon her. The mother testified she "put it together" that Matt W. was the person who perpetrated sexual abuse on Z.D. later, when a friend told her about "very strange" and "awful women things" Matt W. posted on social media. She also testified she exchanged messages online with an unnamed sixteen-year-old girl who claimed to be dating twenty-four-year-old Matt W.

Additionally, the mother testified, "I have had people not believe me when I was younger. I want to be different and, you know, take care of my daughter." She stated that she did not want to put a man before her children. But when asked about not believing Z.D.'s recent statements that Matt M. is the one who touched her inappropriately, the mother responded,

I never said I don't believe her. I just—I have just expressed that it is a hard spot for me to be in.

I am with this person and I have a child with this person and I need to figure out my life of how I can protect my daughter because she said this person did something to her. But I can't just up and move somewhere else and not let this person know about his children or whatnot without, you know, knowing facts or what have you.

The family's long-time social worker testified at the trial. She acknowledged the mother completed a substance-abuse program and completed a number of drug tests that were negative for all substances. And, although she waited nearly a year into the case to begin mental-health therapy, the mother had regular therapy sessions since March 2020. The DHS worker still had concerns the mother needed to "validate [Z.D.'s] feelings and [Z.D.'s] truth."

The court terminated the mother's parental rights pursuant to section 232.116(1)(f), finding Z.D. could not be returned to the mother's care because the mother

will subject [Z.D.] to sexual abuse. [The mother] is adamant the abuse committed was not by her husband Matt. The Court believes [Z.D.] is not mistaken. [The mother's] response, unfortunately, is to encourage more contact between the two. She is now over eighteen months into services but has still failed to separate herself from the person who inflicted the abuse. As Ms. Murray testified, [the mother] needed to accept that *she* was the person who placed [Z.D.] in harm's way and *she* was sorry.

The court found the mother "does not want to believe her own daughter's memory and instead deflects to a story with no corroboration and no credibility." It concluded termination of the mother's parental rights is in Z.D.'s best interests because "[s]he deserves to be in an environment where her parents believe her instead of working to disprove her." Additionally, "it is in [Z.D.'s] best interests to

live free from other children where she risks future victimization and possible delinquent acts."

The mother appeals.

## II. Standard of Review.

We review termination proceedings de novo. *In re J.H.*, 952 N.W.2d 157, 166 (Iowa 2020). We review evidentiary rulings for an abuse of discretion. *In re N.N.*, 692 N.W.2d 51, 54 (Iowa Ct. App. 2004).

## III. Discussion.

### A. Reasonable Efforts.

The juvenile court terminated the mother's parental rights under paragraph (f) of section 232.116(1), which allows the court to terminate when:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The mother does not directly contest any of the four elements, though she maintains DHS failed to make reasonable efforts to reunite her with Z.D., which implicates the fourth element. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination. Instead, the scope of the efforts by DHS to reunify the parent and child after removal impacts the burden of proving those elements of termination which require unification efforts."). "The State must show reasonable

efforts as part of its ultimate proof the child cannot be safely returned to the care of a parent." *In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (citation omitted); *see also* Iowa Code § 232.116(1)(f)(4).

The mother raises a laundry list of services she believes she should have been offered to help reunite her with Z.D., including family therapy, a different therapist to provide a second opinion whether Z.D. was ready for family therapy, forensic evaluation regarding who perpetrated sexual abuse on Z.D., investigating the "many missing links," an expert to complete a "comprehensive review of the case" to set forth a practice involving "potential perpetrator," and services for Matt M. Generally, the mother's argument boils down to the claim she was wrongly prevented from getting more time (with less supervision) with her daughter. She believes her case was improperly stalled because, while everyone else involved believed Z.D.'s allegations the mother's now-husband sexually abused her, the mother "knows" this cannot have happened because Z.D. never met Matt M. until after her removal. The mother suggests the other services and providers she requests—therapists, forensic interviewers, and experts—would side with her, allowing the mother to progress toward reunification with Z.D. while remaining with her husband.

But the mother's claims Matt M. never had access to Z.D. because he never met Z.D. until after her removal lack credibility.[7] They are contradicted by the mother's own evidence in the CINA proceeding. At the September 2020

---

[7] This credibility finding is also supported by the juvenile court's ruling, which concluded Z.D. "is not mistaken" about her allegations involving Matt M. *See In re A.K.*, 825 N.W.2d 46, 49 (Iowa 2013) (providing we "give weight to the factual findings of the juvenile court, especially regarding the credibility of witnesses").

permanency review hearing, the mother introduced into evidence a letter written by the mother of Matt M., in which Matt M's mother stated she "met [Z.D.] several times before she was abruptly taken and moved from foster provider to foster provider until she was placed with the current foster people." The letter continued, "When [Z.D.] was at my home, she was very polite and engaging. She ate meals with us, read stories, and played games like any other child. She and [the mother] and [Matt M.] did family things like walking the dog and baking cookies." Similarly Matt M.'s father wrote a letter that was admitted into evidence, in which he stated he had "spent a lot of time" with the mother and Z.D.

The mother made strides in some areas DHS asked her to, such as proving she was not using drugs and beginning mental-health therapy. But, eighteen months into the proceedings, the mother had not established a protective capacity for Z.D.; she was seemingly willing to lie to the court to protect her husband over her young daughter who had been sexually abused while in her care. *See In re D.D.*, 955 N.W.2d 186, 194–95 (Iowa 2021) ("While . . . creating a family utopia certainly can't be DHS's pursuit, nor can permitting child sexual abusers to live with their victims when the sexual abuser has never admitted to the act and thus cannot have been 'treated' to fix it, and when the victim's only hope of protection is a mother who has steadfastly denied the fact of her husband's sexual abuse of her children and thus can be counted on for no measure of protection."); *In re C.N.*, No. 19-1861, 2020 WL 567283, at *1 (Iowa Ct. App. Feb. 5, 2020) (affirming termination after children were removed upon reports mother's paramour sexually abused child and providers believed the paramour continued to live in the home). As the juvenile court recognized, without more progress from the mother in this

area, the time for more services was past.[8]  *See In re J.C.*, No. 00-2083, 2001 WL 710262, at *1 (Iowa Ct. App. June 13, 2001) ("The efforts to reunite the parent and child, required by statute, are of course to be undertaken very seriously, but with a sense of urgency, and should not deprive the child of a seasonable resolution of a termination proceeding.").

### B. Best Interests.

The mother maintains termination of her parental rights is not in Z.D.'s best interests.  *See* Iowa Code § 232.116(2).  We disagree.  Z.D. needs consistent parenting in a safe home.  *See In re J.E.*, 723 N.W.2d 796, 802 (Iowa 2006) (Cady, J., concurring specially) (identifying "a child's safety" and "need for a permanent home" as the defining elements of a child's best interests).  And the mother is unable to provide those things at this time.

### C. Evidentiary Challenges.

The mother raises three evidentiary challenges.  She argues the juvenile court committed reversible error in excluding the following evidence.

**Photos of "two Matts."**  The mother maintains the court abused its discretion in giving "no weight" to her exhibit showing pictures of Matt M. and Matt W. side by side.[9]  While we do not refuse to consider the admitted exhibit, the

---

[8] In passing, the mother mentions other family members she wanted to be considered as placement options for Z.D.; the mother incorporates this in her "reasonable efforts" argument.  "But challenges to the reasonable-efforts mandate must focus on services that would have led to reunification."  *C.N.*, 2020 WL 567283, at *2.  And we cannot see, and the mother does not explain, how these placement options would have impacted her efforts to reunify with Z.D.

[9] There was some question whether this exhibit was admitted in the juvenile court.  Following an order by this court, the juvenile court clarified that the exhibit was admitted and part of the record but the court "[gave it] no weight as it fail[ed] to

"uncanny similarities" the mother asserts exist between Matt M. and Matt. W. do not change our opinion that the mother's statements about Matt M.'s access to Z.D. are not credible. We need not consider whether the juvenile court should have considered or placed more weight on this evidence, as our review of the overall termination decision is de novo, and our review of this evidence does not convince us termination of the mother's rights is in error. *See, e.g.*, *In re M.P.*, No. 02-0306, 2002 WL 700979, at *3–4 (Iowa Ct. App. Apr. 24, 2002) (refusing to reverse for juvenile court's failure to consider evidence because the appellate court reviewed de novo the excluded evidence—admitted by an offer of proof—and determined the evidence did not change the result).

**Messages from Third Party.** The mother challenges the juvenile court's exclusion of her exhibit showing "communication Matt [W.] had with another female which shows his true color[s] and demonstrates his character—or lack thereof." First, because the mother failed to make an offer of proof, we cannot review either the offered evidence or the juvenile court's ruling. *See, e.g.*, *In re R.W.*, No. 16-1856, 2017 WL 1278365, at *3 n.2 (Iowa Ct. App. Apr. 5, 2017) ("'The purpose of an offer of proof is . . . to make a meaningful record for appellate review. . . .' An offer of proof is important because it preserves error." (second alteration in original) (citation omitted)). And second, it is not apparent to us how it would have helped the mother's case—a case generally about the mother's protective capacity—to introduce evidence purportedly establishing that a man she dated and had watch her young daughter lacks character and is dangerous to young females. *See In*

---

make a fact regarding termination more or less probable" and was "unreliable for the purpose for which it was offered."

*re L.R.*, No. 13-0713, 2013 WL 4504930, at *3 (Iowa Ct. App. Aug. 21, 2013) ("We will reverse an evidentiary ruling only if the record shows prejudice to the complaining party.").

**Expert Witness.** Finally, the mother argues the juvenile court should have granted her request for "payment of fees for a possible expert that could independently review the file, make some recommendations to reunite the family, and possibly testify." A number of professionals were involved in this case, including police investigators, investigative DHS workers, child forensic interviewers, and a therapist for each the mother and Z.D—all trying to work through what Z.D. had experienced and how best to move forward. While most of the professionals involved did not agree with the mother's perception of the case, we cannot say the district court abused its discretion in refusing to order that yet another expert be involved in this case after Z.D. had been removed for eighteen months.

**IV. Conclusion.**

Because DHS made reasonable efforts to reunify the mother with Z.D., termination of the mother's parental rights is in Z.D.'s best interests, and none of the mother's evidentiary challenges require reversal, we affirm the juvenile court's termination of the mother's parental rights.

**AFFIRMED.**