## IN THE COURT OF APPEALS OF IOWA

No. 23-1596
Filed December 20, 2023

**IN THE INTEREST OF A.R.,**
**Minor Child,**

**J.W., Mother,**
      **Appellant.**
_____

Appeal from the Iowa District Court for Dickinson County, Shawna L. Ditsworth, District Associate Judge.

A mother appeals from a child-in-need-of-assistance permanency order establishing a guardianship. **AFFIRMED.**

Tyler J. Alger of Sandy Law Firm, Spirit Lake, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Pamela Wingert of Wingert Law Office, Spirit Lake, attorney and guardian ad litem for minor child.

Considered by Greer, P.J., and Ahlers and Buller, JJ.

**BULLER, Judge.**

The mother appeals a permanency order placing her child A.R., a child in need of assistance (CINA), in a guardianship with the maternal grandparents pursuant to Iowa Code chapter 232 (2023). The mother does not challenge the underlying CINA adjudication but instead alleges the guardianship is not in the child's best interests and the guardians are not suitable. We affirm because the mother is unwilling to acknowledge or address problems with domestic abuse, her husband's substance abuse, animal abuse in the home, and her husband sexually abusing one of her children. We also agree with the juvenile court that guardianship with the grandparents is in the child's best interests.

**I.      Background Facts and Proceedings**

As pertinent to this appeal, A.R. (born 2011) and A.R.'s sibling (born 2008) came to the attention of the Iowa Department of Health and Human Services (HHS) as part of an investigation and assessment into abuse and neglect by the mother and the mother's husband, T.W. T.W. is not the children's biological father, and the biological father is not a party to this appeal.

A.R.'s sibling disclosed that T.W. had sexually abused her on multiple occasions. The mother did not believe A.R.'s sibling, instead claiming the child was confused and remembered abuse perpetrated by the child's biological father. On at least one occasion, the mother laughed when A.R.'s sibling reported that T.W. "squeezed" her breast. A.R.'s sibling also disclosed domestic violence between the mother and T.W., described how the mother and T.W. both used marijuana and once offered it to her, and reported that T.W. and the mother hit her. A.R.'s sibling also described how T.W. threw a cell phone, food, and drinks at her

head. And she recounted how he said things that made her uncomfortable, such as "hey sexy baby, looks like you turned 18 today."

A.R. corroborated marijuana use and domestic violence inside the home. A.R. also described how T.W. grabbed her buttocks, hit her in the head and back with his hand, and threw things at her. According to A.R., the mother did not care when T.W. grabbed her buttocks. Both A.R. and A.R.'s sibling also reported T.W. abused multiple pets in the house—including cats Axel, Smokey, Socks, and Ziggy—by throwing them against walls or down stairs, beating them, or throwing them out of moving vehicles.

These reports resulted in founded abuse assessments against both the mother and T.W. for denial of critical care based on failure to provide adequate and proper supervision and failure to meet emotional needs, citing domestic violence and substance abuse related to both children. The reports also resulted in a founded assessment against T.W. for sexual abuse perpetrated against A.R.'s sibling. The mother generally denied the acts alleged in the assessment but admitted observing T.W. throw the cats and "smack" the children's buttocks "jokingly." T.W. admitted some physical violence and some animal abuse but no sexual abuse. He also admitted using marijuana in the home and hugging A.R.'s sibling while he had an erection—but he said it was an accident and he couldn't stop the child from hugging him.

As part of the safety plan developed during the assessment, the mother agreed both children would stay with their maternal grandparents. The children were later adjudicated CINA and formally placed with grandparents. T.W. was

ordered to have no contact with either child, and HHS arranged services for the family.

T.W. participated in a court-ordered psychosexual evaluation. The evaluators found he was "guarded on testing," and "presently in denial of his own interest in sex most likely because he wants to project himself as asexual." During the evaluation, T.W. admitted smoking marijuana daily and, in the evaluator's opinion, "greatly minimized the amount and extent" of alcohol abuse. He was "defensive" and denied any wrongdoing with respect to either child. With specific regard to sexual abuse, T.W. consistently denied sexually abusing A.R.'s sibling and reported "he feels victimized by the charges made against him." The evaluators recommended T.W. complete an intensive sex offender treatment program (SOTP) and that he not be allowed unsupervised contact with any minors until he completed SOTP and passed a sexual-history polygraph. The evaluators also recommended anger-management therapy and drug- and alcohol-abuse treatment. They specifically noted the mother could not be trusted to supervise contact between T.W. and minors because the mother was "in denial" and "the children would not be safe with her."

At a CINA review hearing, the mother consented to the continued removal of the children. The court also discussed T.W.'s ongoing substance-abuse problems, which the mother minimized, and scheduled a permanency hearing.

As of the permanency hearing, the children had been out of the mother's care for more than a year. The no-contact order between the children and T.W. remained in place, but the mother continued to live with T.W. and he was at least sporadically seen or heard on video calls when the mother contacted the children.

HHS was concerned the mother still did not believe that T.W. had sexually abused A.R.'s sibling. And HHS credited the psychosexual evaluator's opinion that the mother could not be trusted to supervise contact between T.W. and the children because she would not protect them.

In her testimony at the permanency hearing, the mother confirmed HHS's fears. The mother steadfastly maintained she still did not believe T.W. had sexually abused A.R.'s sibling, and she explained she was still living with T.W. and had no plans to change that. She again insisted that A.R.'s sibling was confused by past abuse perpetrated by her biological father. HHS relayed that T.W. still had not participated in—let alone completed—SOTP because enrolling would require him to admit to the sexual abuse. An HHS worker further opined that, without completing SOTP, the department would not support T.W. having any contact with the children. Despite this, the mother maintained it would not be traumatic for A.R. and A.R.'s sibling to live with T.W.

As to the domestic violence, the mother testified: "There was never any domestic." But she then detailed how she and T.W. "had our tempers" and had "flare-ups" and maybe "a phone got threw [sic] once or twice." Yet she maintained "never once was it violent." And as to the substance abuse, the mother's story kept changing when she was confronted with test results that proved T.W. had not maintained consistent sobriety and may have lied to her about marijuana and alcohol use. Exhibits also showed T.W. had not been honest with providers about his drinking.

Although not particularly pertinent to the issues raised on appeal, the record reflects some positive steps taken by the mother, including generally positive visits

with the children, attending therapy more-or-less regularly, and obtaining employment and stable housing (albeit with T.W.). By all accounts, there is a bond between the mother, A.R., and A.R.'s sibling, and they love each other.

During the life of the CINA case, A.R. was hospitalized because of mental-health and behavioral problems. Because of increasing mental-health needs, A.R. had short-lived placements with the grandparents and a foster family before she was placed at a psychiatric medical institution for children (PMIC). She was ultimately diagnosed with a number of psychological conditions and behavior disorders that require ongoing treatment. Although A.R. progressed somewhat slowly through the PMIC program, she made significant progress and—to quote the juvenile court—her "behaviors improved dramatically as she utilized medication management, therapy, [and] behavioral interventions" and "she learned strategies to cope with her emotions in a more effective way." But her progress was uneven. Shortly before the permanency hearing, A.R. relapsed into negative behaviors, including self-harm.

A.R. visited her grandparents' home for visits during her PMIC placement, and the juvenile court expected her to be placed with the grandparents after discharge. Transition services were planned to help A.R. as she moved from PMIC into the grandparents' home. And an HHS worker observed that A.R. was "connected" with her grandparents.

The grandparents became foster parents hoping to care for A.R. and A.R.'s sibling, and HHS believes the grandparents can provide for their needs and provide a safe and loving home. HHS found the grandparents "both worked well with providers, and [have] been a part of staffings, and have ensured that the

[children's] mental health needs are met." HHS also found the grandparents supported the children's relationship with the mother, so long as the relationship did not endanger the children. The mother, on the other hand, testified she believes the grandparents are unsuitable guardians, largely based on complaints about her own childhood. The mother did not believe the grandparents would support her relationship with the children, claiming the grandmother would make "rude comments" about her.

Both children expressed some desire to reunite with their mother, with caveats or reservations. The children's guardian ad litem (GAL) shared that A.R. "wanted to be home with mom when it was safe, and that it was not safe when [T.W.] was there." A.R. consistently told HHS and her GAL that she was "okay" with living with her grandparents and that living with family was the "next best thing" if she couldn't safely return to her mother's care. The mother testified she doubted these were A.R.'s sincere wishes, and blamed A.R.'s sibling for not voicing more concerns directly to the mother.

HHS, the State, and the GAL recommended the children be placed in a guardianship with the grandparents. The juvenile court adopted that recommendation, emphasizing that the mother continued to minimize the family's problems with domestic violence and substance use and continued to deny outright that T.W. had sexually abused A.R.'s sibling. The court also found the mother had made little progress toward reunification and that her protective capacity had not improved since the CINA case began because of her unwillingness to address the sexual abuse. As the court put it, the mother "has repeatedly chosen her relationship with [T.W.] over her children in these

proceedings." The court declined to direct the State to petition for termination of parental rights, largely because the children did not desire it and the guardianship preserved the possibility the children could have a healthy relationship with the mother in the future.

The mother appeals the guardianship as to A.R., but not A.R.'s sibling.

## II.      Standard of Review

"We review [CINA] proceedings de novo. We review the facts and the law and adjudicate rights anew. We give weight to the juvenile court's factual findings but aren't bound by them. The paramount consideration in [CINA] proceedings is protecting the best interests of the children." *In re D.D.*, 955 N.W.2d 186, 192 (Iowa 2021) (internal quotation marks and citations omitted)

## III.     Discussion

The mother first asserts placing A.R. in a guardianship was not in the child's best interests. The mother emphasizes that she has made improvements in some areas since the CINA case began. But, like we noted above, these changes— such as obtaining steadier employment and stable housing—have little to do with the core concern of the CINA case, which was the safety of the children. And, more importantly, these positive steps are tremendously outweighed by the mother's failure to acknowledge significant problems in the home connected to T.W.: domestic violence, substance abuse, animal abuse, and sexual abuse. "[T]he requirement that the parents acknowledge and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs." *In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988). Until the mother acknowledges the problems inside the home, she cannot rectify the deficiencies and she cannot

provide a safe environment for A.R. *See In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999).

We, like the juvenile court, credit the observations of the HHS worker and the report of the psychosexual evaluator. And we are deeply troubled by the mother's failure to recognize even the possibility that T.W. sexually abused A.R.'s sibling. The mother has not and will not choose her children's safety over her relationship with T.W., and she has no insight into the dynamics of abuse or how to protect her children. *See In re W.R.*, No. 21-1472, 2022 WL 470890, at *2 (Iowa Ct. App. Feb. 16, 2022) ("The fact that the mother still has no . . . understanding of where she went wrong leaves us with little to no doubt that those unsafe circumstances still exist."). "The requirement that a parent acknowledge and recognize abuse is essential for any meaningful change to occur." *S.R.*, 600 N.W.2d at 65. The mother has not changed and remains as unable or unwilling to protect A.R. from danger as she was at the time of CINA adjudication.

We are also struck by the fair but pointed argument made by A.R.'s GAL at trial, which was that the mother's position there—essentially also her position on appeal—"asked the court . . . to not believe the [children], to trust instead that [T.W.] is safe to be around and all these allegations are false." We, like the juvenile court, reject the mother's implicit request to disbelieve A.R. and A.R.'s sibling. As our supreme court put it a few years ago in a case with similarities to this one, "It's folly to think the mother will stand sentinel to protect against a foe she doesn't acknowledge exists." *D.D.*, 955 N.W.2d at 193. A guardianship serves A.R.'s best interests, and we hope the possibility of a preserved relationship with the children motivates the mother to make sincere changes.

The gist of the mother's second challenge is that she does not believe A.R.'s grandparents (the mother's biological parents) are suitable guardians. We are not entirely sure where to ground this challenge within the statutory scheme or case law, and apparently neither is the mother: she cites no legal authority directly relevant to this question but argues it is "implicit" within the guardianship option available to CINA courts that selected guardians must be "suitable" or "able to handle the needs of the child." The State, perhaps also unable to discern the legal footing of the mother's second claim, does not separately address it on appeal. We generously construe the mother's petition and understand it as a permutation of her best-interests challenge focused on placement with these particular guardians rather than the mother. And we note the State has not challenged whether the mother has standing to contest the placement.

On this second challenge, we again agree with the juvenile court that this guardianship furthers A.R.'s best interests, for all the reasons we've already discussed. Particular to these guardians, we recognize A.R.'s behavioral problems originally thwarted her placement with them, but A.R. has made significant if uneven progress with treatment at PMIC, and the grandparents have been good partners with PMIC staff by hosting weekend visits with A.R. and participating in discharge planning. We observe that A.R.'s sibling is also placed with the grandparents, which reflects our preference to place siblings together when possible. *See In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006). And we recognize the grandparents have shown commitment to caring for A.R. in a stable home by becoming licensed foster parents, supporting the HHS and law enforcement investigations, and facilitating visits to ease A.R.'s transition to her new home.

We affirm the juvenile court's order in its entirety, finding it serves A.R.'s best interests in compliance with chapter 232.

**AFFIRMED.**