**IN THE COURT OF APPEALS OF IOWA**

No. 24-0759
Filed November 13, 2024

**IN THE INTEREST OF K.R.,**
**Minor Child,**

**K.C., Mother,**
     Appellant.

_____

Appeal from the Iowa District Court for Des Moines County, Jennifer S. Bailey, Judge.

A mother appeals the termination of her parental rights to her two-year-old child. **AFFIRMED.**

Heidi D. Van Winkle of Van Winkle Law Office, Burlington, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Kyler Massner of Cray Law Firm P.L.C., Burlington, attorney and guardian ad litem for minor child.

Considered by Tabor, C.J., and Ahlers and Sandy, JJ.

**TABOR, Chief Judge.**

A mother, Karissa, appeals the termination of her parental rights to her two-year-old son, K.R.  She contends the juvenile court erred in finding that the State proved the statutory grounds for termination, termination is in the child's best interests, a statutory exception does not apply, an extension is unwarranted, and the State made reasonable efforts to reunite them.

On our de novo review of the record, we find that despite substantial progress and demonstrated sobriety, Karissa continues to display poor judgment when it comes to the company she keeps.  She also continues to mislead service providers and the court about her contact with people who pose a risk of domestic violence and drug use.  So despite two and half years of services, Karissa is unable to care for K.R. safely.  We affirm the decision of the juvenile court.

**I.      Facts and Prior Proceedings**

K.R. tested positive for benzodiazepine at his birth in June 2021.  Karissa told the child protective worker that she struggled with addiction during her pregnancy.[1]  After a founded child abuse assessment, the Iowa Department of Health and Human Services determined that K.R. was "conditionally safe" in Karissa's care.  But in August 2021, Karissa's paramour, Jesse,[2] assaulted her in K.R.'s presence.  Karissa also admitted using methamphetamine while caring for then two-month-old K.R.  The court approved K.R.'s removal from parental custody

---

[1] Karissa's substance use contributed to the termination of her parental rights to another child in 2015.

[2] Jesse was K.R.'s legal father, but his rights were terminated in 2022.  K.R.'s biological father, Larry, was incarcerated and did not participate in these proceedings.  The juvenile court terminated his rights.  Neither party participates in this appeal.

in September. The court adjudicated him as a child in need of assistance (CINA) that same month.

In October, Karissa entered the Heart of Iowa inpatient drug-treatment program. She made progress and transitioned into an apartment for outpatient treatment. The department social worker reported Karissa was engaged in services and had a job. So in late November 2021, the court placed K.R. back with his mother, contingent on her successfully completing the Heart of Iowa program. But, soon after that return, a counselor at Heart of Iowa reported that Karissa had interacted with Jesse in violation of his criminal no-contact order. Karissa admitted that contact to the court in April 2022. Over the next several months, the situation worsened, and Karissa was fired from her job. She expressed frustration and anxiety about her financial situation and lack of support.

Then, in August 2022, Karissa reported to her attorney that she relapsed, using methamphetamine intravenously for two days in a row while caring for K.R. The court removed K.R., placing him with a foster family, and Karissa entered inpatient substance-use treatment in October, this time at House of Mercy in Des Moines. After doing well for several months, including taking domestic violence awareness classes, Karissa applied for an eighteen-month program that would allow her to keep K.R. with her. She stocked her room with a crib and other essentials for caring for her son. And the department agreed to give her unsupervised overnight visits on weekends from Friday to Monday.

Concerns arose that winter about Karissa's relationship with Josh H. because she had previously used drugs with him. Still, in May 2023, the court ordered that K.R. be returned to Karissa so long as she remained in the House of

Mercy program. But on the same day as the order—before the department could return K.R. to her care—Karissa was discharged from House of Mercy for breaking a rule about recording other clients.[3] She entered another residential program, High Tower in Clinton, until she could be readmitted to House of Mercy. Because Karissa did not have a valid driver's license, Roger, a friend with whom she previously used drugs, agreed to help her move from Des Moines to Clinton.[4]

Karissa reentered House of Mercy in fall 2023 and renewed weekend visits with K.R. She had a job and was attending all court-ordered therapies. Given that progress, the court deferred permanency for six months to give her more time to reunify with K.R. In September, Karissa moved for more visitation, asking to start weekend visits on Thursday instead of Friday. The court denied that request, reasoning it would interfere with Karissa's ability to work and support K.R. financially, even though daycare was available for Karissa at House of Mercy. The court also accepted the department's assertion that the foster parents had K.R. in daycare and it could not "pay two separate daycare providers, per administrative guidelines."

---

[3] The fellow client at House of Mercy was causing a disruption and was potentially going to make Karissa late for a court hearing, so Karissa recorded the incident on her phone. House of Mercy informed her that this was a Health Insurance Portability and Accountability Act violation.

[4] At the termination hearing, evidence was presented that Roger was in recovery himself. Although the State argued Roger was another inappropriate associate for Karissa, the court acknowledged that when someone has a long history of addiction, sometimes their only friends are also drug users or former drug users. Because there was no evidence that Roger influenced Karissa to lapse or had any negative influence based on one car ride, the court did not give the incident the weight the State requested. Karissa also testified that if confronted with that situation today, she would find another ride.

Meanwhile, concerns reemerged that Karissa was still romantically involved with Josh H. While Karissa denied this, the State presented his Facebook posts stating they were in a relationship. Also in September, the foster mother reported she had seen a contact named "Josh" on Karissa's phone and that K.R. returned from a visit stating that he spent time with "daddy Josh" that weekend. On other occasions, K.R. returned from visits with painted nails and a temporary tattoo and explained that "daddy Josh" gave those to him. Another time, K.R. told the foster mother his "other daddy" took him to McDonalds.

At the December permanency review hearing, Karissa testified that she didn't know why K.R. was talking about Josh, but she admitted talking to Josh H. on the phone in October. She continued to deny being in a romantic relationship with him. In the January 2024 permanency review order, the juvenile court directed the State to file a petition for termination of parental rights. The court's rationale was that, despite prolonged and intensive substance-use and mental-health treatment, Karissa maintained a "relapse mentality" as shown by her discharge from House of Mercy after the videotaping incident, her continued association with Josh H., and her dishonesty about the nature of that relationship.

At the termination hearing in March 2024, the social worker reported on Karissa's progress. In short, Karissa had been sober since October 2022, submitted to all drug testing, was in residential rehabilitation, had a plan for ongoing substance-use treatment, had a job, and had shown herself capable of meeting K.R.'s basic needs. The only reported negatives were that Karissa had only shown sobriety within "a structured setting" and had "no stable housing at this time." Yet the department recommended terminating her parental rights.

K.R.'s guardian ad litem (GAL) also recommended termination. The GAL identified these concerns: (1) Karissa's "continued engagement with past users/paramours"; (2) the "risk of trauma to the child should he be returned and removed a third time"; (3) her "inability to demonstrate she can be a safe, sober, and appropriate caregiver and independently meet the child's financial, emotional, and health needs"; and (4) her history of drug use, mental-health concerns, abusive relationships, and the fragility of her sobriety without intensive formal supports.

In response to the concerns about her relationship with Josh H., Karissa suggested for the first time at the termination hearing that K.R. might be referring to Josh L., a friend she met at High Tower. Josh L. also has a history of drug use and domestic abuse assault. Karissa testified that she didn't bring up her contact with him earlier because she didn't think it was important.

The juvenile court did not believe Karissa could "maintain her sobriety over the long term, while living in the community." Nor did the court believe that she could resume custody of K.R. "based on continuing behaviors that put her sobriety in jeopardy, namely dishonesty, a continued need of validation from men, and continued contact with drug users." It terminated her rights under Iowa Code section 232.116(1)(h) (2024). Karissa appeals the termination order.[5]

---

[5] We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). On de novo review, "we examine the whole record, find our own facts, and adjudicate rights anew." *In re M.H.*, ___ N.W.3d ___, ___, 2024 WL 3050791, at *1 (Iowa Ct. App. 2024) (citation omitted). We respect the juvenile court's fact findings, especially when they rest on witness credibility. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). But we are not bound by them. *Id.* Our primary concern is the best interests of the child. *Id.*

## II.     Discussion

### A.  Statutory Grounds

We begin with Karissa's contention that the State did not prove the statutory grounds under Iowa Code section 232.116(1)(h).  She maintains that K.R. could be returned to her custody at the time of the termination hearing.[6]  *See* Iowa Code § 232.116(1)(h)(4) (requiring clear and convincing proof "that the child cannot be returned to the custody of the child's parents as provided in section 232.102"); *see also In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (holding "at the present time" means the date of the termination hearing).  She argues that she showed a significant period of sobriety and stability.

We agree that, on most measures, Karissa made substantial progress toward resuming custody of K.R.  She demonstrated her sobriety for eighteen months.  When she had a lapse into drug use, it was because of the strain of her financial and employment situation.  After entering the House of Mercy, she engaged in treatment for substance use, mental health, and domestic violence prevention.  When discharged in May 2023, she was on the cusp of having K.R. returned to her custody.  Her discharge was unrelated to safety issues.  She then got back on track, reentered treatment, and secured a job.  And she consistently

---

[6] Our case law offers two formulations for what it means when a child "cannot be returned" to parental custody as provided in section 232.102, which discusses transferring the child's custody if staying in the home would be "contrary to the welfare of the child."  Many cases cite *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992), which provides a child cannot be returned if it would expose him or her to "any harm amounting to a new child in need of assistance adjudication."  But our supreme court often describes the fourth element as the inability to "safely return" children to their parents' care.  *See, e.g.*, *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *2–3 (Iowa Ct. App. Apr. 15, 2020) (collecting cases).  Under either formulation, the State met its burden of proof here.

demonstrated her ability to care for her son, as there were no significant safety concerns during her weekend-long visitations.[7]

Despite this progress, the department continued to doubt Karissa's ability to parent K.R. in the long term. Karissa has had intensive services for almost two and a half years, including several stays in residential substance-use treatment. And while she has maintained sobriety for a good stretch, she has never done so outside of a monitored treatment setting.

More concerning is Karissa's deceit about her conduct and what that dishonesty means for the long-term prospects of her sobriety. Karissa articulated what she learned in treatment, including the significance of triggers and the dangers of associating with people from her past who have either physically abused her or used illegal drugs with her. But at earlier hearings, when asked whether she was still seeing Josh H., a known methamphetamine user, she denied that contact, despite his social media posts referring to their intimate relationship.

When those concerns arose again at the permanency hearing in December 2023, she could not explain why K.R. talked about "daddy Josh." And it wasn't until the termination hearing that Karissa brought up Josh L. In her testimony, she explained she met Josh L. in July 2023 while she was at High Tower. They began texting and calling each other weekly. Karissa hypothesized that K.R. learned his name from the speakerphone. Karissa also disclosed for the first time that K.R. met Josh L. when they ran into him at a baseball game. She also explained that

---

[7] The department was concerned that Karissa gave K.R. melatonin to help him sleep and submitted a letter from his primary care physician that she does not recommend it for him. There is no evidence Karissa gave it to him again.

when she returned to House of Mercy in September, she discovered Josh L. had a criminal history and current drug and domestic violence charges, so she tried to cut off contact.

When the court questioned why she didn't bring up Josh L. at the December permanency hearing when concerns arose about K.R. mentioning "daddy Josh," Karissa stated that she "didn't think it was important." Later, she testified:

> I didn't want to say anything about Josh because of part of his background, and I didn't want you to be pissed off at me. . . .
> . . . .
> [A]nd it's like you guys never believe anything that I say. All of the stuff that I say is always thrown out because you guys never say anything that I say is truthful. And it's like it doesn't matter if I come up for myself or not. It doesn't matter.
> THE COURT: So your testimony is that you did recall that you had talked to Josh [L.] when [K.R.] was in the hospital, but you didn't want to bring it up based on your knowledge of his criminal record and other negative history that we would not be—that we would be judgmental of because not—we're not positive that you're in contact with him. Is that what you're saying? A.: Correct.

Because Karissa deliberately did not bring up Josh L. at the earlier hearing, the juvenile court found she lacked credibility when she testified at the termination hearing. The court found it particularly significant that Karissa was dishonest about this contact, which she also identified as possibly leading to relapse into drug use and posing a risk of domestic violence.

We share the juvenile court's concerns. Karissa learned enough about her triggers through intensive services to know that she was flirting with a dangerous liaison that jeopardized her sobriety and safety. Yet she chose to conceal the relationship because of how it looked. And it is not just herself she put at risk— she allowed K.R. to interact with Josh L., who had drug and domestic violence charges. And, given K.R.'s reports of contact with Josh, it is hard to credit Karissa's

testimony that their interactions were limited to phone calls and the baseball game. Given Karissa's poor judgment, we doubt her ability to keep K.R. safe.

As a final note, while Karissa's current period of sobriety is admirable, she has not avoided drug use while in the community. And in the past, financial strain has contributed to her relapsing. She would no doubt face that same stress when she leaves the House of Mercy and strives to support K.R. on her own.[8] Because struggling to make ends meet presents a risk to her sobriety, it is an appropriate factor to weigh when deciding whether the child can be returned to her custody.

Her fragile sobriety—combined with her risky associations and dishonest reporting—leads us to the same conclusion as the juvenile court. The State presented clear and convincing proof that K.R. cannot be safely returned to her custody at the present time.

## B. Best Interests

Next, Karissa contends that termination was not in K.R.'s best interests. In assessing that point, we give primary consideration to his safety; to the best placement for furthering his long-term nurturing and growth; and to his physical, mental, and emotional condition and needs. *See* Iowa Code § 232.116(2). The "defining elements" of a child's best interests are the need for safety and a

---

[8] Her self-sufficiency counselor testified that they worked on budgeting. And Karissa testified she had over $700 in savings. The juvenile court did not "have concerns about Karissa's ability to provide for [K.R.'s] basic needs." It determined that Karissa "should be able to do what many low-income single mothers do, which is to make it work with what they have."

We recognize that a parent's economic disadvantage should not be the driving force behind a termination decision. *In re Z.T.D.*, 478 N.W.2d 426, 428 (Iowa Ct. App. 1991). But, at a minimum, a parent must be able to provide a child with life's necessities. *Id.*

permanent home. *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially).

Karissa cannot offer K.R. either safety or permanency—given her history of drug lapses, the lack of demonstrated independence, and her ongoing choice of risky companions and dishonest reporting. And time is not on her side; K.R. has been out of Karissa's custody for eighteen consecutive months and adjudicated CINA for nearly his whole life. His need for permanency weighs heavily toward terminating Karissa's parental rights and allowing him to be adopted. What's more, K.R. has been with the current foster parents for over a year. He is integrated into their family. And they are willing to adopt him. *See Iowa Code* § 232.116(2)(b) (requiring court to consider whether child has been "integrated into the foster family" such that his "familial identity is with the foster family" and whether the foster family is willing to be a permanent home). Termination is in K.R.'s best interests.

### C. Statutory Exception

Karissa next cites her strong bond with K.R. as an exception to termination under Iowa Code section 232.116(3)(c).[9] For that provision, a parent must show by "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." *Id.* § 232.116(3)(c). Karissa testified that K.R. would suffer harm if her rights were terminated. True, she has been consistent with visitation, and K.R. is sad to leave her. But he expresses the same sadness when departing the foster home. There

---

[9] The State is right that Karissa conflates the standards of best interests, *see* Iowa Code section 232.116(2), and the applicability of the statutory exception for the parent-child relationship, *see id.* § 232.116(3)(c). We address them separately.

is no other evidence that severing their legal relationship would cause K.R. harm. So we decline to apply this permissive exception. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).

### D. Extension

Karissa also argues that she should be granted six more months under section 232.104(2)(b) to reunify with K.R. To continue placement for six months, that statute requires the court to decide "the need for removal will no longer exist at the end of the extension." *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005). The juvenile court found no reason to believe that after two and a half years of services, Karissa would be in a different position in six months. Neither do we. Her dishonesty and risky conduct persisted over time, and nothing in the record suggests that will change in six months.

### E. Reasonable Efforts

Finally, Karissa contends that the State did not meet its reasonable-efforts mandate. *See* Iowa Code § 232.116(1) (2022); *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination. Instead, [it] . . . impacts the [State's] burden of proving those elements of termination which require reunification efforts."). The department must "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *Id.* (citation omitted).

Karissa argues that the department failed to make reasonable efforts when it declined to expand her visitation, arguing it could not pay for a second daycare provider. The court sided with the department, finding that it could not pay two

daycares "per administrative guidelines." But that was only a secondary reason—the court also cited financial strain being identified as a trigger for Karissa and her need to show she could be financially independent to avoid relapsing. Her intensive treatment schedule left limited time for employment, so the court reasoned expanded visitation would disrupt her availability to work.

On appeal, the State concedes there is no policy or rule that prevents the department from paying for two daycares. Karissa testified that she had access to daycare services on site at House of Mercy, so she would have been able to attend her treatment and work while K.R. was with her.

Still, the department is only obligated to provide reasonable services under the circumstances. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000). Reasonable efforts include "visitation designed to facilitate reunification while providing adequate protection for the child." *C.B.*, 611 N.W.2d at 493. We find that the department provided reasonable visitation. Karissa had three days and three nights unsupervised each weekend, and the department transported K.R. between southeast Iowa and Des Moines each time. We do not think an extra day would have appreciably improved the chances of reunification, especially when K.R. reported interacting with unsafe people during those visits. The department's efforts were reasonable under the circumstances. We affirm the termination of parental rights.

**AFFIRMED.**